CITY OF ST. PAUL v. CHICAGO, MILWAUKEE & ST. PAUL RAILWAY
COMPANY.[1]

May 10, 1895.

Nos. 9139—(39[2]–95[3]–514[4]).

**Adverse Possession—Interruption—Recognition of Rights of Public.**

Evidence *held* sufficient to justify a finding that in 1879 there was such a recognition on part of defendant's grantor (St. P., M. & M. Ry. Co.) of the rights of the public and of the city in the premises in controversy as to interrupt the continuity of its adverse claim; and hence that defendant had not acquired title by 20 years' adverse possession before the commencement of this action.

**City Ordinance—Revocable License.**

City Ordinance No. 286, passed April 21, 1882, construed as a mere revocable license to defendant to erect certain structures on the premises referred to. (Modified as below.)

**Sp. Laws 1872, c. 93—Right of Railway Company to Occupy Public Levee with Tracks.**

Sp. Laws 1872, c. 93, construed as granting the defendant the right, as against the public and the city, to occupy the premises in controversy (a part of the public levee) with its railroad tracks to the extent necessary to make and maintain a continuous connection through the city between its two lines of railway formerly known, respectively, as the St. Paul & Chicago Railroad and the Minnesota Central Railroad.

On First Reargument. January 7, 1896.

**Municipal Corporation—Rights in Public Levee.**

A municipal corporation has no proprietary rights in the streets, levees, or other public grounds within its territorial limits  Whatever rights it has in them it holds merely in trust for the public.

**Same — Grant of Use of Public Levee to Railway Company for Freight House—Sp. Laws 1874, c. 1, subc. 4, § 7.**

A municipality has no authority over such public grounds, except such as is delegated to it by the legislature. The "care, supervision and control" of

[1] Reported in 63 N. W. 267, 65 N. W. 649, and 68 N. W. 458.

[2] April, 1895, term calendar.

[3] October, 1895, term calendar.

[4] April, 1896, term calendar.

all public highways, streets, etc., within the city limits, given to the common council of the city of St. Paul by the city charter (Sp. Laws 1874, c. 1, subc. 4, § 7), did not authorize the council to grant to a railway company the right to construct and maintain a freight house on a "public levee" for its own exclusive use.

### Same—Sp. Laws 1874, c. 1, subc. 4, § 11.

Section 11 of the same subchapter, providing that "the common council shall have power and authority  *  *  *  to grant the right of way upon, over and through any of the public streets, highways, alleys, public grounds or levees of said city to any steam railway or horse railway company or corporation upon such limitations or conditions as they may prescribe by ordinance," only authorized the common council to grant the right of trackage; that is, the right to construct and operate railroad tracks on and over the public grounds within the city, but not to occupy and use such grounds as a site for depots, freight houses, or other buildings.

### Same—G. S. 1894, § 2642.

G. S. 1878, c. 34, § 47 (see G. S. 1894, § 2642), provides that "if it becomes necessary in the location of any part of a railroad to occupy any road, street, alley or public way or any part thereof, it shall be competent for the municipal or other  *  *  *  public authorities owning or having charge thereof, and the railroad company to agree upon the manner and upon the terms and conditions upon which the same may be used or occupied." *Held*, that this only authorizes municipal or other public authorities to agree or arrange with a railroad company as to the manner or terms upon which it may occupy public streets or ways with its railroad tracks, but does not authorize them to grant to the railroad company the right to occupy them as sites for its depots, freight houses, or other like structures.

### Same—Validity of City Ordinance.

Ordinance No. 286 of the city of St. Paul, by which the common council assumed to grant to the defendant the right to occupy a part of the public levee as a site for a permanent freight house, was invalid because in excess of the powers of the common council. (Modified as below.)

On Second Reargument.    September 28, 1896.

### Dedication to Public Use—Legislative Power of Control.

Where land has been dedicated to a specific, limited, and definite public use, the legislature has no power to destroy the trust, or divert the property to any other purpose inconsistent with the particular use to which it was dedicated. The state holds such property, not in a proprietary, but in a sovereign, capacity, in trust for the use to which it was dedicated. While much must be left to the discretion of the legislature as to the best manner of regulating that use, yet its power of control over such property must be exercised in conformity with the purpose of the dedication.

**Same—Erection of Warehouse.**

The erection of a warehouse on land dedicated to public use as a levee is not necessarily a misuse of the property, as such structures may be in aid of the use for which it was dedicated.

**Same—Grant of Exclusive Use to Railway Company.**

The legislature may also grant, or authorize the granting, to any person or corporation having traffic with craft navigating the contiguous waters, the exclusive use of so much of a public levee as is reasonably necessary for his or its business, with such craft, provided, and so long as, it does not unreasonably interfere with the use of the levee by the public. But to give a public levee, or any part of it, to a railway company, as a permanent site for its general freight warehouse, without reference to its traffic with craft navigating the contiguous waters, would constitute a diversion of the property to a use foreign to, and inconsistent with, that to which it was dedicated.

**Same—G. S. 1894, § 2680—City Ordinance.**

While the language of G. S. 1894, § 2680, is broad enough to authorize a city to divert lands held in trust for a specific and particular use to another and inconsistent one, and while the language of Ordinance 286 of the city of St. Paul may be equally broad, it does not follow that either is void in toto.

**Same—Construction of Statute and Ordinance.**

The operation of the statute may be restricted by construction to a grant of authority to municipalities to grant to railway companies such rights in public grounds as the legislature itself might have granted, and the ordinance, although too broad, will be valid to the extent of such granted rights as the city was authorized to grant.

**Same—Revocation of Grant—Vested Rights of Licensee.**

A grant of special privileges on land dedicated to a particular public use is always subject to the implied condition that it may be revoked whenever the needs of the public require, and the state or municipality has a large discretion in determining when such a condition has arisen; but such a grant, rightfully made, is not revocable at the mere arbitrary pleasure of the state or municipality. When such a grant has been acted on, the licensee has vested rights in the license which are subject only to the paramount interests of the public.

**Cause Remanded.**

Cause remanded to the court below to try and determine the issue whether the privileges granted to the defendant by Ordinance 286 constitute, either in whole or in part, an unlawful misuse of the property, and to modify, if necessary, its order for judgment accordingly.

Appeal by defendant from an order of the district court for Ramsey county, Kelly and Otis, JJ., denying a motion for a new trial. Modified, and remanded for trial of issue concerning City Ordinance No. 286.

*W. H. Norris, Flandrau, Squires & Cutcheon,* and *F. W. M. Cutcheon,* for appellant.

Mr. Hill was without authority to execute the petition on behalf of the railway company. It was incumbent on plaintiff to show that, in signing the petition, he acted under authority from the company, or that the company, while still in possession .of its interest as an adverse claimant, ratified his act with full knowledge of all the facts. James v. Indianapolis & St. L. R. Co., 91 Ill. 554; City of St. Paul v. Chicago, M. & St. P. R. Co., 45 Minn. 387, 394, 48 N. W. 17. Mr. Hill did not intend by executing the petition to abandon the railway company's claim of title. His act in executing the petition was never ratified by the railway company. To establish ratification it was necessary for plaintiff· to show: (1) Actual knowledge on the part of the company of the act assented to and of all the material circumstances affecting it (2 Morawetz, Priv. Corp. § 628; Yellow Jacket Silver Min. Co. v. Stevenson, 5 Nev. 224; Clarke v. Lyon County, 7 Nev. 75; Owings v. Hull, 9 Pet. 607, 629); (2) intent on the part of the company to adopt the act as the act of the corporation (2 Morawetz, Priv. Corp. §§ 628– 629). Knowledge possessed by one member of a board, or of any number less than a majority, of a fact affecting the interests of the company does not constitute knowledge on the part of the board, unless such knowledge be obtained in the course of the performance of a duty by such member or members, or concerns a subject on which he or they have special authority to act. Yellow Jacket Silver Min. Co. v. Stevenson, supra; Shaw v. Clark, 49 Mich. 384, 13 N. W. 786; Mayor of New York v. Tenth Nat. Bank, 111 N. Y. 446, 457, 18 N. E. 618; Fairfield Sav. Bank v. Chase, 72 Me. 226; Buttrick v. Nashua & L. Railroad, 62 N. H. 413; Farmers & C. Bank v. Payne, 25 Conn. 444; Farrel Foundry v. Dart, 26 Conn. 376. Ratification by silence is ratification by acquiescence, and acquiescence cannot be implied unless there be a duty to speak or profit to be obtained by speaking. Evans v. Smallcombe, L. R. 3 H. L. 249, 260, per Lord Chelmsford; Kersey Oil Co. v. Oil Creek & A. Railroad, 12 Phila. 374, 376; Ormsby v. Vermont Copper Min. Co., 56 N. Y. 623. Non-action on the part of the board or executive committee would not show intention to adopt Mr. Hill's act, unless the

matter had been presented to the board when assembled. Baldwin v. Canfield, 26 Minn. 43, 1 N. W. 261. If authority can be given only in one way, ratification can occur only in the same way. Despatch Line of Packets v. Bellamy Mnfg. Co., 12 N. H. 205. Nothing has occurred that estops defendant to deny ·that the vacation petition constituted an abandonment of the Manitoba Company's claim of title. City of St. Paul v. Chicago, M. & St. P. R. Co., 45 Minn. 387, 395-6, 48 N. W. 17. No abandonment of its claim of title made by the Manitoba Company as late as the date of the vacation petition could have any effect on the title to the land in dispute, as against defendant. Basset v. Nosworthy, 2 Lead. Cas. Eq. 1; Dickerson v. Tillinghast, 4 Paige, Ch. 215.

Even if the land in dispute be part of a public levee, defendant has the right to occupy and use the premises for railroad purposes by Sp. Laws 1872, c. 93. The state has the right to dispose of a public levee with or without the consent of the municipal corporation in such manner as appears to it advantageous to the public interest. Dillon, Mun. Corp. §§ 71, 701. The company has, by virtue of the contract between it and the legislature, the right to lay and maintain its tracks on the public levee at any point between the former terminus of the Minnesota Central Railroad and Dayton's Bluff. Nash v. Lowry, 37 Minn. 261, 33 N. W. 787; Hovelman v. Kansas City H. R. Co., 79 Mo. 632; City of St. Louis v. Western U. Tel. Co., 63 Fed. 68, 70, and cases cited. The act did not contemplate condemnation by the company of the public easement. Moreover the company already possessed the right to make such condemnation by general law. G. S. 1866, c. 34, tit. 1, § 29; G. S. 1878, c. 34, tit. 1, § 47. Defendant is entitled by contract with plaintiff by virtue of the city ordinance to maintain its upper freight house and the tracks leading thereto where they now are. The ordinance constituted an offer, which after acceptance is binding. G. S. 1878, c. 34, §§ 47, 48. There was formed thereby an irrevocable contract. Nash v. Lowry, supra; Hovelman v. Kansas City H. R. Co., supra; City of St. Louis v. Western U. Tel. Co., supra; State v. Town of Lime, 23 Minn. 521; County of Cass v. Gillett, 100 U. S. 585, 593, 594.

*Edward J. Darragh, Hermon W. Phillips*, and *Henry J. Horn*, for respondent.

MITCHELL, J.    The first trial of this case resulted in a decision in favor of the defendant, which was affirmed on appeal to this court.    45 Minn. 387, 48 N. W. 17.    A second trial, to which the plaintiff was entitled under the statute (49 Minn. 88, 51 N. W. 662), resulted in a decision in favor of the plaintiff, and from an order denying a new trial the defendant appeals.

The facts are fully stated in the opinion on the first appeal, and need not be repeated.    Suffice it to say that the premises in dispute are a part of what has been called "Island 11," another portion of which was the subject of litigation in Schurmeier v. St. Paul & P. R. Co., 10 Minn. 59 (82), and Railroad Co. v. Schurmeier, 7 Wall. 272.    The city of St. Paul claims the premises as a public levee, under a dedication in 1854 by one Hopkins, the grantee of Louis Roberts.    On the other hand, the defendant railway company contends (1) that Hopkins never owned the land, but that its predecessors and grantors acquired title to the whole of "Island 11" as part of the federal railroad land grant of March 3, 1857 (11 Stat. 195); (2) that, even if Hopkins owned it, he never dedicated it to the public; (3) that, even if he owned and dedicated the land, yet it has since acquired title to it by 20 years' adverse possession by itself and its grantors; and (4) that, even if the public has an easement in the land for levee purposes, yet defendant has a right to maintain certain tracks and structures upon it under the legislative act of February 28, 1872 (Sp. Laws 1872, c. 93), and also under Ordinance No. 286 of the plaintiff city, passed April 21, 1882.

The Schurmeier Case is decisive that Louis Roberts, Hopkins' grantor, acquired title to the land in question under patent from the United States; and the evidence is plenary that Hopkins dedicated it to the public for levee purposes.    This disposes of defendant's first and second contentions.    Therefore, aside from defendant's claim to the limited right of use of the premises under the legislative act and the city ordinance referred to, the case comes down to the single question whether the defendant had, before the commencement of this action, acquired title by 20 years' adverse possession.

Upon the last trial, as upon the first, the greater part of the evidence and of the arguments of counsel was directed to this issue.

The possession of those under whom defendant claims commenced not earlier than the winter of 1862–63. It may be assumed for present purposes that up to September, 1879, this possession was hostile, exclusive, notorious, and continuous; so that, if not thereafter interrupted, it would have ripened into title in the winter of 1882–83. The main and pivotal question in the case is whether the evidence justified the trial court in finding, as we must presume it did, that the continuity of this adverse possession was interrupted, before the statute of limitations had run, by a recognition by the occupant (either the defendant itself or its grantor, the St. Paul, Minneapolis & Manitoba Railway Company) of the title and right of the public and the plaintiff city. The evidence tending to prove such recognition was in several respects stronger than on the first trial, and, in our opinion, was amply sufficient to justify the finding of the court.

It is familiar law that, in order that adverse possession may ripen into title, there must be continuity of adverse possession for the statutory period. Hence a recognition by the occupant of the title of the owner will break the continuity of claim, as well as the continuity of possession, although the occupant continues in possession of the premises; and in such case he must begin de novo if he would claim the benefit of the statute of limitations. If he continues in possession of the premises after such break in the continuity of claim, the benefit which he might have obtained from his prior adverse possession is, nevertheless, determined, and if, after such break, the occupant should again attempt to hold adversely to the title of the real owner, such adverse possession will be held to commence from that time, and the occupant will not be permitted to tack his former possession.

One alleged act of recognition of the public right in the land in controversy by the then occupant, the Manitoba Company, is the petition, presented to the city council September 16, 1879, asking for the vacation of parts of certain designated streets and a part of this same public levee, in order to enable the Union Depot Company to erect a Union Depot and secure railroad track communication therewith. The tenor of this petition and the subsequent action of the city council in granting, in part, its prayer, on January 8,

1880, are quite fully stated in the opinion on the former appeal. 45 Minn. 387, 394, 395, 48 N. W. 17. The nature of the scheme then on foot to provide a union depot and terminal facilities for all railroads coming into St. Paul is too familiar as a matter of local history to require to be related at length. It is enough for present purposes to say that the contemplated site for this depot, and the one subsequently used for that purpose, consisted of certain lots (and the intervening streets and a part of the levee abutting on these lots) then owned by the Manitoba Company, which that company proposed to convey, and afterwards did convey, to the Union Depot Company, in which the Manitoba Company was itself a shareholder. The effect of the act of the city council was that the title of the land vacated was in the Manitoba Company, relieved of the burden of any public easement, and thus to enable it to subsequently convey an unincumbered title to the entire tract to the Union Depot Company, which it did for the sum of $75,000. As was said on the former appeal, the part of the levee asked to be vacated did not include the land in controversy; but, if it was a public levee, it would necessarily follow that the land in controversy was also, for the color or claim of title on the part of the Manitoba Company and the title of the public and the city were precisely the same as to both. Hence, assuming that Mr. Hill had authority to act in the premises for the Manitoba Company, the petition was, on its face, a recognition of the right of the public and the city in the land in controversy, and that the possession of the Manitoba Company was subordinate to that right.

It is contended, however, (1) that Mr. Hill never intended to recognize any such right, because he did not know, when he signed the petition, that it asked for the vacation of any part of the levee east of Sibley street, which included all of the levee to which the Manitoba Company ever asserted an adverse claim; (2) that he had no authority to act in the premises for the Manitoba Company; and (3) that that company never ratified his act. We are of opinion that the evidence would justify a finding on each and all of these questions adversely to the defendant.

The presumption is that a person knows the contents of an instrument which he signs. Mr. Hill was the general manager of the

63 M.—22

Manitoba Company, and, as such, was, according to his own testimony, invested with very large powers. He was one, at least, of the chief promoters of the Union Depot scheme. He was the representative of his company in all matters pertaining to that enterprise. He must have been entirely familiar with the condition of the title to the premises, and hence must be presumed to have known that the passage of this ordinance of vacation by the city council was necessary to the successful consummation of the proposed scheme to provide a Union Depot. It must also be kept in mind that the claim of the Manitoba Company to "Island 11" had been judicially determined to be unfounded; also, that at the date of this petition the adverse possession, if any, of the railway company, had not yet ripened into title, and could not do so, in any event, for more than three years. With these facts Mr. Hill must have been familiar. Hence, had he known the exact contents of the petition, there was every reason why he should sign it, and no conceivable reason why he should not. As against this array of circumstantial evidence, the mere recollection or memory of Mr. Hill, after the lapse of a number of years, and after the situation of affairs had wholly changed, was by no means conclusive.

And, in considering the evidence as to Mr. Hill's authority to act in the premises for the Manitoba Company, it must be recollected that, as that company's possession had not yet ripened into title, the fact, if fact it was, that he had no authority to make contracts affecting the title of its real estate, is not controlling. The evidence of adverse possession, on the one side, and of disclaimer, on the other side, all consisted of what may be termed "matters in pais,"—of what certain persons from time to time did as representing the defendant or its predecessors. What Mr. Hill did, as general manager of the Manitoba Company, by way of asserting a claim to the premises in its behalf, would have been competent evidence for the defendant to establish its claim; and, if so, then certainly the same character of evidence would be competent in behalf of the plaintiff to establish a disclaimer by it. The fact that the Manitoba Company has never repudiated or disaffirmed Mr. Hill's act, but accepted and has all these years retained the benefits of it, is competent evidence tending to prove both prior authority and subsequent ratification.

The evidence already considered was of itself sufficient to justify the court in finding that there was such a recognition by the Manitoba Company in 1879 of the right of the public and the city as interrupted the continuity of the prior adverse possession. It therefore becomes unnecessary to consider the subsequent action of the defendant itself in petitioning the city council in June, 1881, for leave to construct the "lower warehouse," and in April, 1882, for approval of the plan of its proposed new "freight house" and for leave to extend the river front of the same a certain distance further out than the river front of the old building.

It only remains to consider what rights, if any, the defendant has under City Ordinance No. 286 and under the legislative act of February 28, 1872. An examination of the ordinance satisfies us that it amounts to nothing more than a revocable license. Its language is that of a license or permit, and not of a grant.

By the terms of Sp. Laws 1872, c. 93, the defendant was required to make and maintain a continuous connection, through the city of St. Paul, between the St. Paul & Chicago Railway (river road), which it had just purchased, and its line formerly known as the Minnesota Central Railway; and to that end it was authorized, among other things, "to the extent that [was] reasonably necessary to the establishment and maintenance of such connection, [to] enter upon and cross over or under the tracks, roadbed and lands of any other railroad corporation, and any other lands, streets and highways, with its own tracks necessary to maintain such connection, condemning the same to its own use in the same manner and upon the like terms and conditions as the St. Paul and Chicago Railway Company or the St. Paul and Pacific Railroad Company are authorized to condemn land for right of way and railway purposes, but the right to condemn and occupy any other street in the city of St. Paul shall not be exercised so long as said company have the right to use the public levee for such connection, and can accomplish such connection by the use of such levee." It is apparent that this act gave to the defendant the same rights to enter upon and cross over streets and highways with its tracks, necessary to the maintenance of this connection, which were possessed by the St. Paul & Pacific Railroad Company in like cases. The rights of the latter company

in that respect are defined in Laws 1857 (Ex. Sess.) c. 1, subc. 1, § 7. It is also apparent that the act was designed to give them these rights in the public levee as well as in "other streets." By virtue of its paramount authority over all highways, the state had the power to confer this privilege or right so far as the public easement was concerned. But this could not affect the private property rights of abutting owners (Gray v. First Div. St. Paul & P. R. Co., 13 Minn. 289 (315); hence the necessity for authorizing the defendant to exercise the right of eminent domain whenever necessary.

It is contended by plaintiff that, under the provisions of this act, the defendant could only acquire the right of way over and across streets and the levee by condemning the public easement as well as the private property rights of abutting owners. The statute is somewhat awkwardly worded, but we do not think that this is its proper construction. The city, in its corporate capacity, has no proprietary interest in a public street or a public levee. It holds the title merely in trust for the general public. If the public easement was to be condemned, how could its value be estimated, and to whom would the compensation be payable? Our construction of the statute is that it is a grant of the privilege or right of use so far as the public easement is concerned, but that if such use amounts to an additional servitude upon the street or levee, which affects the private property rights of individuals, the defendant may acquire such rights by the exercise of the right of eminent domain. Our conclusion, therefore, is that, under the provisions of this statute, the defendant has the right, as against the public and the city, to occupy this levee with its tracks so far as necessary to make and maintain a continuous connection through the city between its two lines referred to in the act.

The court found that defendant's two northerly tracks across the premises in controversy constitute a section of the line constructed by defendant to make and maintain a continuous connection, through the city, between these two lines, and that these two tracks, with their continuations east and west of the premises in controversy, furnish and afford the defendant the only practical means of making and maintaining this connection. The conclusions

of law and order for judgment must therefore be modified so as to permit defendant to maintain these two tracks.

The defendant assigns as error the rulings of the court in admitting various items of evidence, but we find no substantial merit in any of them, and nothing of sufficient importance to require special notice.

Cause remanded, with directions to the court below to modify its conclusions of law and order for judgment in accordance with this opinion.

_____

The railway company having petitioned for a rehearing in reference to its rights under the city ordinance cited, on May 28, 1895, the court granted a reargument of the cause "in so far as it involves the force and effect of City Ordinance No. 286 and the rights of the defendant thereunder." Pursuant thereto there was a reargument on December 11, 1895.

*Flandrau, Squires & Cutcheon*, for appellant.

Ordinance No. 286, together with the acts performed under it, gave rise to an irrevocable contract between plaintiff and defendant, under protection of which defendant is entitled to maintain and occupy its freight-house and river-siding where they now are. The city, acting through its common council, had the capacity to enter into the contract. Sp. Laws 1874, c. 1, subc. 4, § 7. Statutory provisions of this kind have uniformly been held to confer upon city councils authority to grant to railway companies the right to occupy public streets, at least as against the city and the public. 2 Dillon, Mun. Corp. § 719; St. Louis v. Western U. Tel. Co., 149 U. S. 465, 13 Sup. Ct. 990; Gregsten v. City of Chicago, 145 Ill. 451, 34 N. E. 426; Julia Bldg. Assn. v. Bell Telephone Co., 88 Mo. 258; City of St. Louis v. Bell Tel. Co., 96 Mo. 623, 10 S. W. 197; Hodges v. Baltimore U. P. R. Co., 58 Md. 603; Elliott v. Fair Haven & W. R. Co., 32 Conn. 579. Authority to grant such rights was expressly conferred on cities by G. S. 1878, c. 34, § 47. (See G. S. 1894, § 2642.) The contract is lawful because the use to which the premises are put by the railway company is a public use. Kaiser v.

St. Paul, S. & T. F. R. Co., 22 Minn. 149. The agreement does not attempt to convey, create or destroy any interest in the land, but if it did attempt to do so, i. e. to surrender the public easement pro tanto, the agreement, whether valid as a deed or not, would constitute a defense in a court of equity to a proceeding to oust the grantee, after it had performed its side of the contract. 2 Story, Eq. Jur. § 759; 1 Pomeroy, Eq. Jur. § 383; Pfiffner v. Stillwater & St. P. R. Co., 23 Minn. 343; Gill v. Newell, 13 Minn. 430 (462); Place v. Johnson, 20 Minn. 198 (219); Johnson v. Skillman, 29 Minn. 95, 12 N. W. 149; Brown v. Hoag, 35 Minn. 373, 29 N. W. 135; Evans v. Miller, 38 Minn. 245, 36 N. W. 640. On the question whether the agreement constitutes an irrevocable contract, the intention of the parties must control. Johnson v. Skillman, supra; Minneapolis Mill Co. v. Minneapolis & St. L. R. Co., 51 Minn. 304, 311–314, 53 N. W. 639. The language of the grant is not that of a license or permit but rather that of a grant. Fletcher v. Peck, 6 Cranch, 87, 136. Defendant is entitled to insist that the privilege granted shall continue, so long as the structures remain open and subject to the use of the public for wharfage and transfer purposes without charge, and so long as it continues to discharge its obligations to the city. City of St. Louis v. Western U. Tel. Co., 63 Fed. 68; City of New Orleans v. Great Southern T. & Tel. Co., 40 La. Ann. 41, 3 South. 533. The intention of the council that the privilege granted should be irrevocable, at least under present conditions, is manifest, and to permit the city to revoke the privilege at this time would operate as a fraud on defendant. Such being the case, plaintiff is estopped to claim that, under the contract, it possesses any right of revocation. St. Louis v. Western U. Tel. Co., 148 U. S. 92, 13 Sup. Ct. 485, 63 Fed. 68; Rerick v. Kern, 14 S. & R. 267; Cumberland V. R. Co. v. McLanahan, 59 Pa. St. 23; Pierce v. Cleland, 133 Pa. St. 189, 19 Atl. 352; Clark v. Glidden, 60 Vt. 702, 15 Atl. 358; Western U. Tel. Co. v. Bullard, 67 Vt. 272, 31 Atl. 286; Rhodes v. Otis, 33 Ala. 578; Veghte v. Raritan Water Power Co., 19 N. J. Eq. 142.

Where a contract, containing no express provision as to the duration of the rights granted, does provide for a large investment or the payment of a considerable consideration by one of the parties,

and the investment is made or the consideration rendered, there arises a conclusive presumption of law, in the absence of provisions plainly indicating the contrary, that the contract is intended to be irrevocable except by mutual consent.     City of New Orleans v. Great Southern T. & Tel. Co., supra; New Orleans, S. F. & L. R. Co. v. Delamore, 114 U. S. 501, 5 Sup. Ct. 1009; St. Louis v. Western U. Tel. Co., supra; Coast Line R. Co. v. Mayor of Savannah, 30 Fed. 646; Hudson Tel. Co. v. Jersey City, 49 N. J. Law, 303, 8 Atl. 123; Hovelman v. Kansas City H. R. Co., 79 Mo. 632; Rutland E. L. Co. v. Marble City E. L. Co., 65 Vt. 377, 26 Atl. 635; Gregsten v. City of Chicago, supra; Brooklyn Central R. Co. v. Brooklyn City R. Co., 32 Barb. 358; Mayor of New York v. Second Ave. R. Co., 32 N. Y. 261; Mayor of New York v. Third Ave. R. Co., 33 N. Y. 42; Com. v. Proprietors of New Bedford Bridge, 2 Gray, 339; Binghamton Bridge Case, 3 Wall. 51; Horner v. Pleasants, 66 Md. 475, 7 Atl. 691; Classen v. Chesapeake Guano Co., 81 Md. 258, 31 Atl. 808; City of New Orleans v. Great Southern T. & Tel. Co., supra; Le Fevre v. Le Fevre, 4 S. & R. 241; Rerick v. Kern, supra; Swartz v. Swartz, 4 Pa. St. 353; Cumberland V. R. Co. v. McLanahan, 59 Pa. St. 23; Pierce v. Cleland, supra; Ricker v. Kelly, 1 Me. 117; Clark v. Glidden, supra; Western U. Tel. Co. v. Bullard, supra; Woodbury v. Parshley, 7 N. H. 237; Ameriscoggin Bridge v. Bragg, 11 N. H. 102; Rhodes v. Otis, supra; Sheffield v. Collier, 3 Ga. 82; Russell v. Hubbard, 59 Ill. 335; Wickersham v. Orr, 9 Iowa, 253; Wright v. Nagle, 101 U. S. 791; Citizens' Street R. Co. v. City R. Co., 56 Fed. 746; Weston v. City Council of Charleston, 2 Pet. 449, 462.     Contract rights such as are here under consideration are within the protection of U. S. Const. art. 1, § 10; Binghamton Bridge Case, supra; Chicago v. Sheldon, 9 Wall. 50; New Orleans W. W. Co. v. Rivers, 115 U. S. 674, 6 Sup. Ct. 273; New Orleans Gas Co. v. Louisiana Light Co., 115 U. S. 650, 6 Sup. Ct. 252; Monongahela Nav. Co. v. United States, 148 U. S. 312, 13 Sup. Ct. 622.     An attempt on the part of the city council to revoke a privilege thus secured by contract is the act of the state.     Wright v. Nagle, supra; Citizens' Street R. Co. v. City R. Co., supra; Weston v. City Council of Charleston, supra.

*Edward J. Darragh* and *Henry J. Horn*, for respondent.

January 7, 1896, the following opinion was filed:

MITCHELL, J.    This appeal has once before been considered by this court.    The record and briefs were very voluminous, and the main issue was whether the defendant had acquired absolute title to the premises in controversy by adverse possession.    The oral arguments were wholly, and the briefs mainly, devoted to a discussion of that question.    The natural result was that other and less important issues received but little attention from either court or counsel.

The defendant's claim of certain rights under City Ordinance No. 286 was disposed of in our opinion by merely saying that the ordinance amounted to nothing more than a revocable license; that its language was that of a license or permit, and not of a grant. Upon an application for a reargument of this question, we became satisfied that sufficient consideration had not been given to it, and that there was at least grave doubt whether the ordinance, if valid, did not constitute an irrevocable contract between the city and defendant.    We therefore ordered a reargument of the question as to the force and effect of this ordinance, and the rights of the defendant under it.    This involves two questions:    First, the authority of the city council of St. Paul to pass the ordinance; and, second, if the council had the power to pass it, its force and effect. These questions should be considered in the order named; for, if the ordinance is held invalid, it will be unnecessary to consider the second question at all.

The land in question fronts on the Mississippi river, and was dedicated by the original proprietor to public use as a "levee."    Defendant's grantor, being in possession of the premises and claiming adversely to the city, had erected thereon a wooden freight house, fronting on the river, and some 400 or 450 feet long.    In 1881, after defendant took possession, it presented a petition to the common council of the city of St. Paul, stating that it contemplated taking down this freight house, and replacing it with a large and permanent one, and asking permission in the meantime to erect a temporary wooden structure.    This permit was granted, the limit of the permit being two years.    In March, 1882, the defendant presented a further petition to the common council, stating that it was then ready to

construct its new freight house, which was described as to be a large, elegant, and permanent structure, plans of which were submitted. The petition further stated that, in order to carry out the plan of the structure as demanded by the growing commerce of the city, it would be necessary to extend the river front of the building out into the river from seven to ten feet further than the front of the old one; and requested the council to approve the plan of the proposed building, and to grant permission to extend it out into the river to the limit above mentioned. The plan proposed was of a building about 600 feet long and 50 feet wide, of brick, with stone foundation and a slate roof. In response to this petition the council, in April, 1882, by a unanimous vote, passed the ordinance in question (No. 286), which is as follows:

"Section 1. That permission be and the same is hereby given to the Chicago, Milwaukee & St. Paul Railway Company to take down and remove the old freight-house, which is owned and used by said company, standing next below Sibley street on the levee, and to erect a new freight building upon the site now occupied by said old freight-house, provided that the new structure may be extended a distance of ten feet nearer the Mississippi river than the old one, if the city engineer shall be of the opinion that the same shall in no manner interfere with the navigation of said river. And provided further, that said new freight-house shall be built substantially in accordance with the plans on file in the office of the city clerk. And provided, that the basement or lower story fronting on the river shall be laid with substantial floor, and said lower story, together with the platform on the river front, and the railway track along the said river front, shall be open and subject to the use of the public for all wharfage and transfer purposes without charge, and a sufficient platform and entrance for drays shall be provided for said lower story at the end of said building.

"Sec. 2. Nothing in this ordinance contained shall be construed as waiving any of the rights of the city of St. Paul in and to the real property proposed to be occupied by said building.

"Sec. 3. This ordinance shall be in force from and after its passage."

Thereupon the defendant proceeded and erected, and has ever since maintained, the freight house, in accordance with the provisions of the ordinance.

It may be here suggested that the authority of defendant's grantor, the St. Paul, Minneapolis & Manitoba Ry. Co., under its char-

ter (Laws 1857, Ex. Sess. c. 1, subc. 1. § 7), "to construct their said railroad and branches upon and along, across, under or over any public or private highway," etc., "if the same shall be necessary," does not extend to or contemplate the construction upon a highway of stations, depots, freight houses, or other buildings, but applies only to railroad tracks, where the use of the highway by the railroad company will be concurrent with that of the general public, and not exclusive. Village of Wayzata v. Great Northern R. Co., 50 Minn. 438, 52 N. W. 913.

It is elementary law that a municipal corporation has no proprietary rights in the streets, levees, or other public grounds within its limits. Whatever rights it has it holds merely in trust for the public. It is equally elementary that all its powers over such public grounds are derived from the legislature. It can exercise no power over them, except such as is given it by the legislature, either expressly or by necessary implication. It is also well settled that a grant of power to a city to grant any privileges or rights in streets or other public grounds is to be strictly construed, and not enlarged by construction; and, if there is a fair or reasonable doubt as to the existence of its power, it will be resolved against the municipality. Dillon, Mun. Corp. § 705; City of St. Louis v. Bell Tel. Co., 96 Mo. 623.

With these general principles in mind, we come to the consideration of the provisions of the charter of the city of St. Paul relating to the powers of the city council over public grounds within its limits, and which were in force in 1882, when Ordinance No. 286 was passed. The charter then in force was Sp. Laws 1874, c. 1, and amendments. Subchapter 4, § 7, of that act, provided that "the common council shall have the care, supervision and control of all public highways, bridges, streets, alleys, public squares and grounds, and parks and sewers, and all other public improvements and public property within the limits of said city." The able counsel for the defendant seems to rely with confidence on this as giving authority to the common council to pass the ordinance in question. He says: "Statutory provisions of this kind have uniformly been held to confer upon city councils authority to grant to railway companies the right to occupy public streets; at least, as against the city

and the public." We have examined all the authorities cited by counsel, and submit, with all deference to him, that none of them support his contention. Some of these cases merely hold that a certain use of a street, as by erecting telephone poles and wires, or constructing a horse railroad, is a proper "street use," and imposes no additional servitude on the street; while others are merely to the effect that, under a general grant of power to regulate the use of streets, the city council has the power to prescribe the manner in which, or the conditions upon which, streets may be occupied for a legitimate "street use." In Gregsten v. City of Chicago, 145 Ill. 451, 34 N. E. 426, the city had an express grant of authority to do what it did. In St. Louis v. Western U. Tel. Co., 149 U. S. 465, 13 Sup. Ct. 990, the only thing decided was that the city was authorized by the constitution and laws of Missouri to impose upon a telegraph company putting its poles in the streets of the city a charge in the nature of rental for the use of the streets for that purpose. Neither party was in position to question the authority of the city to permit the company to place its poles in the streets, for it was by virtue of the exercise of this power that the city claimed the right to make the charge, and the permit granted by the city in the exercise of this assumed power constituted the only right on the part of the company to put its poles in the street. We are of the opinion that the "care, supervision, and control" of streets and public grounds, and the power to regulate their use, which is the usual and ordinary grant of power to municipal corporations, and which is certainly as broad as the power granted by the section above quoted, is not sufficient to empower them to authorize the use of such grounds for the purpose even of constructing and operating thereon a commercial railway, much less of erecting thereon depots, freight houses, or other buildings which exclude the general public from the concurrent use of a part of the street or other public ground. Dillon, Mun. Corp. § 705, and cases cited; Lackland v. North Missouri R. Co., 31 Mo. 180. In this state these would not be proper "street uses," but the imposition of an additional servitude upon the street.

Section 8 of the same subchapter of the city charter gives the common council power to vacate and discontinue public grounds, etc.,

upon certain conditions, but it will not be claimed that this section has any application to the case in hand.

The only other provision relating to the power of the common counsel in the premises is section 11 of the same subchapter, which reads as follows: "The common council shall have power and authority, by a vote of three-fourths of all the members elect of said council, to grant the right of way upon, over and through any of the public streets, highways, alleys, public grounds or levees of said city to any steam railway or horse railway company or corporation, upon such limitations or conditions as they may prescribe by ordinance." We may consider this in connection with G. S. 1878, c. 34, § 47 (see G. S. 1894, § 2642), cited by counsel for defendant, which reads as follows: "If it becomes necessary in the location of any part of a railroad to occupy any road, street, alley or public way or any part thereof, it shall be competent for the municipal or other corporation or public officer or public authorities owning or having charge thereof, and the railroad company to agree upon the manner and upon the terms and conditions upon which the same may be used or occupied; or such company may appropriate so much of the same as may be necessary for the purposes of said road in the same manner and upon the same terms as is herein provided for the appropriation of the property of individuals." Section 11 of the charter quoted above clearly refers only to "trackage"; that is, to the right to construct and operate railroad tracks on the streets or other public grounds. This is conclusively shown by the term "right of way." It does not give the common council any authority to barter away, or transfer to a railroad company, the right to use any part of the streets or public grounds as a site for depots or freight houses, to the entire exclusion of the public therefrom. This seems to us too plain to require argument. It also seems to us that the provision of the General Statutes cited is subject to the same limitation. The phrase, "in the location of any part of a railroad," clearly indicates to our minds that this also refers only to "trackage," and that it is but the counterpart and equivalent of section 11 of the city charter. It was never intended to authorize municipal authorities to sell or give away to railroad companies, as sites for depots and other buildings, lands in which they had no proprietary

interest, and which they held merely as trustees for the public. Any such power would be an exceedingly dangerous one to vest in municipal authorities, and it would require very clear language to that effect to warrant a court in holding that the legislature intended to grant them any such power. Whether the authority of railway corporations to acquire rights in streets and other public lands by the exercise of the right of eminent domain is limited to "trackage" or "right of way," it is not necessary now to consider.

If there is any other provision of statute containing any grant of power to the common council of St. Paul over public grounds within its limits, our attention has not been called to it by counsel, neither have we found it. Nowhere do we find any grant of power authorizing the common council to give the defendant the right to use and occupy any part of the public levee as a site for its freight house. It follows that this ordinance is invalid because not within the granted powers of the common council.

We have not overlooked the difference between a "street" and a "levee." A street is designed exclusively for the purposes of travel and intercommunication. The word "levee," as used in the West and South, means a landing place for vessels, and for the delivery of merchandise to and from such vessels, and, as incident to that, for the temporary storage of the merchandise. Hence, some things might be a proper use of a public levee which would constitute a misuser of a street. For example, the erection and maintenance of a warehouse as a place for the receipt and delivery and temporary storage of goods while in transit would probably be a proper use of a levee, provided it was open to the common use of all on the same terms. This would be in aid of and necessary to the main object for which a levee is designed. But this is a very different thing from giving to a particular person or corporation the right to occupy a levee as a site for its warehouse solely for its own business, and to the exclusion of the general public, as was attempted by the ordinance in question. The fact that the common council stipulated that a small part of the structure might be used by the public for wharfage and transfer purposes does not alter the case.

It can hardly be necessary to say that the fact that the defendant may have expended its money on the faith of this ordinance cre-

ates no equitable estoppel against the public, whose mere trustee the city is in prosecuting this suit. The defendant was bound to take notice of the extent of the powers of the common council from which it obtained the ordinance.

The result is that the former decision is adhered to, although, as to the point now considered, upon a different ground.

On January 20, 1896, the following order of the court was entered: "In this cause it appearing from the petition of the defendant that its counsel overlooked and failed to call the attention of the court to G. S. 1894, § 2680, it is ordered: That further argument be allowed, but only as to the force and effect of said section, the same to be submitted on printed briefs either on or before the last day of the present term, or * * *." Pursuant to this order the cause was submitted on printed briefs June 1, 1896, and additional briefs were filed September 1, 1896.

*W. H. Norris, Flandrau, Squires & Cutcheon,* and *F. W. M. Cutcheon,* for appellant.

*E. J. Darragh* and *H. J. Horn,* for respondent.

September 28, 1896, the following opinion was filed:

MITCHELL, J. It is somewhat unfortunate that the questions involved in this case have been presented and considered piecemeal. On the trial in the court below the main issue was whether the defendant had acquired title to the premises by adverse possession, and very little attention seems to have been paid to the rights, if any, of the defendant under City Ordinance 286; that question having apparently been brought into the case only incidentally and almost accidentally. On the first argument of the appeal in this court, the discussion was almost wholly devoted to what had been the main issue in the court below. The result was that we disposed of the ordinance, without much consideration, by merely saying that it amounted to nothing more than a revocable license. Upon the reargument of this question the main point discussed, and the only point considered, was whether the state had delegated to the city authority to enact the ordinance in question. We held that the

ordinance was invalid, because in excess of the granted powers of the city. After this opinion was filed, counsel for the defendant applied for further reargument, on the ground that they had overlooked, and failed to call the attention of the court to, G. S. 1894, § 2680. A further reargument was thereupon granted as to the force and effect of this section.

Upon an examination of the case after it was submitted on this last reargument, it occurred to us that there might be a serious question as to the power of the state itself to grant any such authority to the city over public grounds dedicated to a specific public use. As this question was only briefly discussed by counsel for the defendant, and not at all by counsel for the plaintiff, we, on our own motion, requested additional briefs on that point. After an examination of the additional briefs filed in response to this request, we are inclined to think that perhaps a more important question was whether the purposes for which a portion of this levee was granted to the defendant by this ordinance constituted a diversion of it from the particular and specific public use to which it was dedicated. In order that the precise questions involved may be clearly in mind we shall again quote in full the statute now relied on, and also the ordinance enacted in pursuance of it, which defendant claims constitutes a binding contract between it and the city, an impairment of the obligation of which is forbidden by the federal constitution.

"The common council, board of aldermen, trustees, commissioners or other corporate authorities of any city, town, village or other municipal corporation, are hereby authorized and empowered to grant, sell, convey, or lease any public grounds or place within their respective corporate limits to any railroad corporation; subject nevertheless to all the rights of the original proprietors of such public grounds." G. S. 1894, § 2680.

This statute was enacted over 30 years ago. Gen. Laws 1866, c. 41.

[In the opinion filed, here follows Ordinance No. 286, in full, as printed above, p. 345.]

We shall, without further discussion, take as settled that the premises in question were dedicated by the owner, Hopkins, to public use, as a "levee" or "landing." The word "levee" has a well-understood meaning in the West and South. It is a place, on a

river or other navigable water, for lading or unlading goods, or for the reception and delivery of passengers. It is either the bank, or the wharf, to or from which persons or things may go from or to some vessel in the contiguous waters. State v. Randall, 1 Strob. 110; State v. Graham, 15 Rich. Law, 310; Coffin v. City of Portland, 27 Fed. 412, 418. It means the land contiguous to a river or other navigable water, used as a landing place for water craft, and for the transfer of freight and passengers to and from such craft. In a general way, this is at once the definition and limitation of the particular and specific public use to which this land was dedicated by the owner.

It is elementary and fundamental law that, if a grant is made for a specific, limited, and definite public use, the subject of the grant cannot be used for another and different use. Its use must be restricted to that for which it was dedicated. Even the legislature itself has no power to destroy the trust, or to divert, or to authorize a municipality to divert, its subject to any other purpose, either public or private, inconsistent with the particular use to which it was granted. Neither the state nor the municipality within which the property is situated has any proprietary interest in it which either of them can sell or divert to any use inconsistent with the purpose of the dedication or grant. The state holds such land merely in its sovereign capacity, in trust for the public for the purposes for which it was dedicated. If the legislature should attempt to divert it, or to authorize its diversion, the property would not revert to the donor, or the public easement be extinguished. The act of the legislature would be a mere nullity. The cases relied on by defendant's counsel decide nothing inconsistent with these propositions. See Portland & W. V. R. Co. v. City of Portland, 14 Or. 188, 12 Pac. 265; Illinois & St. L. R. & C. Co. v. City of St. Louis, 2 Dill. 70, Fed. Cas. No. 7,007. It is frequently stated that the power of the legislature, in the absence of special restrictions, over public places held for the use and benefit of the public, is unlimited; but we think that in every well-considered case it will be found that this general proposition is qualified by the statement, in substance, that this power must be exercised in subordination to, and in conformity with, the purposes of the dedication.

However, no narrow or unreasonable definition should be placed upon the nature of the use to which the property has been dedicated, nor any unreasonable limitation imposed upon the discretion of the legislature in regulating that use. Much must necessarily be left to the discretion of the legislature as to the best manner of regulating that use, and of improving the property for that purpose; and the mode or manner of exercising that use must be allowed to keep pace with changed conditions and consequent new necessities of the public. It is only when there has been a clear diversion of the property to a use inconsistent with that for which it was dedicated that courts would feel warranted in interfering; and this will usually be largely a question of fact, depending upon the facts and circumstances of each particular case.

No doubt the legislature, as the representative of the public, has the power, either directly or indirectly, through the municipality, or even through a private corporation or person, to improve these premises for "levee purposes." It might construct, or authorize the construction and maintenance of, wharves or warehouses thereon as aids to and conveniences for public travel and traffic to and from craft navigating the river, and impose, or authorize the imposition of, charges for the use of such structures sufficient to defray the cost of their construction and maintenance. This would not only be consistent with, but in aid of, the principal use for which the land was dedicated. The legislature might also grant, or authorize the granting, to any person or corporation having traffic with vessels on the river, the exclusive use of so much of a levee as was reasonably necessary for his or its business with such vessels,—provided it did not unreasonably interfere with the use of the levee by the remainder of the public,—until such time as the needs of the public required the termination of such exclusive use. The construction and maintenance of a permanent structure does not by any means necessarily constitute a misuse of a levee. Like the grain elevator referred to in Illinois & St. L. R. & C. Co. v. City of St. Louis, supra, it might be in aid of the very use for which a public levee is designed. To give a public levee, or any part of it, to a railway company, to be used as a site for its depot, or for its general freight warehouse, without reference to its traffic by way of

63 M.—23

the transfer of passengers and freight to and from vessels navigating the adjacent river or other navigable water, would, in our opinion, constitute a diversion of the property to a use foreign to and inconsistent with that for which a levee is dedicated.   So much for the general principles of law applicable to the case.

The language of section 2680 is broad enough to permit, if not require, a construction which would effect a purpose which the legislature has no power to authorize.   It would authorize the absolute sale or gift of any public ground, for whatever purpose dedicated, to any railroad company, to be used for any purpose for which such company might hold or use real estate, and thus wholly extinguish all rights of the public in the premises.   The legislature has no such unlimited power over land dedicated to a specific and particular public use, but it does not follow that the statute is wholly void and ineffectual for any purpose.   Its operation may be cut down by construction within the limits of the legislative powers, and held effectual to authorize a municipality to grant to a railroad company any rights or privileges in public grounds which the legislature itself might have granted; that is, any rights or privileges consistent and in conformity with the purposes for which such grounds were dedicated.   We cannot agree with the contentions of plaintiff's counsel that this general statute has been by implication repealed as to the city of St. Paul by subsequently enacted provisions of the city charter, or that the statute does not apply to public grounds of the character of this levee.

We are therefore brought to the consideration of the provisions of the ordinance itself, as to whether the rights and privileges assumed to be granted to the defendant are in conformity with the use for which the land was dedicated, or are so inconsistent with and foreign to that use as to amount to an unauthorized diversion of it.

Unfortunately the record furnishes comparatively little light on this question, because, for reasons already suggested, the case was not tried on any such lines.   In fact, no such issue seems to have been tried at all.   All that the record clearly shows is the provisions of the ordinance itself, and the further fact that this freight house has been constructed and is maintained in accordance with

those provisions, It, perhaps, also fairly appears that there are some 1,400 feet front of public levee, including that situated within the plat of St. Paul proper, and that this building is about 350 feet long on the river front by about 50 feet wide. The ordinance is entirely silent as to the length of time for which the privilege is granted to the defendant, or as to the uses to which the structure may be devoted, except as to the lower story. Neither does it in terms reserve to the city any right to supervise or regulate the manner of its use. The record is also practically silent as to the purposes for which the defendant is actually using this building, or as to the extent or nature of defendant's traffic with vessels or other craft navigating the river. Under the terms of the ordinance, the defendant might devote the whole of the building, except the lower story, to uses wholly foreign to "levee purposes," and entirely disconnected with its exchange traffic with craft navigating the river; and, for anything the record shows, such may be the fact. Neither does it appear whether there exists any present public necessity for the use of this land for levee purposes. This last consideration would, of course, not be controlling, for the fact that the land is not presently needed for levee purposes would not prevent the city or state, as the trustee of the public, from objecting to a diversion of the property to a use wholly foreign to or inconsistent with that to which it was dedicated; but, for reasons to be stated hereafter, it would be material in determining whether the city or state, as such trustee, had a right to recall or revoke a special privilege previously lawfully granted. But the fact, if it be a fact, that the ordinance assumes to grant to the defendant rights and privileges greater than the city was authorized to grant, will not render the ordinance wholly void. It would still be valid to the extent of such rights and privileges as the city was authorized to grant.

We shall not stop to consider upon which party rested the burden of proof on these matters, for, in view of the manner in which the case was tried and submitted, we are satisfied that final judgment for or against either party on these questions ought not to be rendered on the present record. Justice requires that the cause be remanded to the trial court, to determine, in accordance with the rules we have endeavored to lay down, whether the privileges granted by

the ordinance do or do not amount to an unlawful diversion of this part of the levee to a purpose inconsistent with that for which it was dedicated.   If they do not, either in whole or in part, then the order for judgment in favor of the plaintiff should be further modified so as to make it subject to the right of the defendant to maintain this building in accordance with the terms of the ordinance. If, on the other hand, such privileges, in their entirety, constitute a plain diversion of the premises to an unauthorized use, the trial court should so find, and in such case the present order for judgment would stand unmodified in that regard.   If, however, the court should find that within the rules already suggested, the privileges granted by the ordinance were in part authorized, but in part unauthorized, then the court should determine how far they were authorized, and how far they were not; that is, how much of the levee is reasonably required as a site for a freight house for the accommodation of defendant's traffic as common carrier, with craft navigating the contiguous river, and cut down the operation of the ordinance to the limits to which its provisions were authorized, and modify the order for judgment accordingly.

If it be objected that this furnishes no definite and exact rule, the answer is that such instances are not infrequent in the law, and one of the most useful functions of the judiciary is the exercise of a sound judgment and common sense in such cases.   As already suggested, no such narrow construction of the term "levee purposes" should be adopted as to deprive the defendant of any privileges properly granted to it, or to limit too narrowly the reasonable discretion of the state or city in regulating the use of the property; nor, on the other hand, should so lax a construction be indulged in as to sanction a plain diversion of it to a use foreign to and incompatible with that to which it was devoted by the owner.   Any grant of privileges upon lands dedicated to a particular public use is necessarily subject and subordinate to the rights and necessities of the public, and may always be revoked and terminated whenever required by the needs of the public in the use of it for the purpose for which it was dedicated.   This is an implied condition of every such grant, for there can be no irrevocable license, as against the rights of the public to the full enjoyment of its easement in the

property; and, as to when a condition of things has arisen that public interests require a revocation of the grant or license, much must be left to the discretion of the state or municipality, as the trustee of the public. But such a license, if lawfully granted, and subsequently acted on by the licensee, is not revocable, in the ordinary sense of the word; that is, it is not revocable at the mere arbitrary pleasure or whim of the state or municipality. The licensee in such a case has vested rights under the license, subject, only, to the paramount rights of the general public in the property for the use to which it was dedicated. We might also add that, if the privileges granted to the defendant by this ordinance were, in whole or in part, authorized as a legitimate use of the property for "levee purposes," the fact that such privileges, thus authorized, may incidentally benefit the defendant in a way not strictly germane to "levee purposes," would not render the grant a diversion of the property to an unauthorized use.

We may be pardoned for adding the suggestion that, inasmuch as the plaintiff has accomplished the main purpose of this suit by establishing its title to the whole of the premises in dispute as a public levee, and also its right of immediate and exclusive possession, subject only to the right of the defendant, under the act of the legislature, to maintain certain railroad tracks across the property, and to whatever rights it may have, under this city ordinance, to maintain this freight house on a certain portion of the property, and as nothing remains to be determined except the extent of these rights under the ordinance, it would seem that two great and progressive organizations, like the plaintiff city and the defendant railway company, ought to be able, without further prolonging this already protracted litigation, to adjust this matter, on the legal lines suggested in this opinion, on a liberal basis, that will at once protect the rights of the public and the defendant company.

Cause remanded for a new trial, but only of the issue considered in the foregoing opinion, and for such modification of the findings of fact and conclusions of law as may be made necessary by the determination of such issue.

START, C. J.   I dissent.

BUCK, J.   I also dissent.