NORTHWESTERN TELEPHONE EXCHANGE COMPANY v. CITY OF MINNEAPOLIS and Others.[1]

August 6, 1900.

Nos. 12,223—(266).

### Municipal Corporation—Telephone Wires.

The city council or governing body of a municipality has the undoubted right in the exercise of the police power to order the placing of telegraph and telephone wires under ground whenever, in the exercise of a fair discretion, it decides that public interests require it to be done; but it cannot act arbitrarily in the premises.

### Same—City Ordinance a Contract with Company.

An ordinance of a municipal corporation granting a telephone company the right to use its streets for the erection of poles and over-head lines, under conditions as to permits and directions as to where the same shall be placed, when accepted and acted upon by the company, is a contract which the municipality cannot unreasonably or arbitrarily repeal or amend so as to impair rights acquired under it.

### Same—Unreasonable Regulations.

When such an ordinance has invited investments and expenditures made in good faith and in reliance upon it, the city authorities cannot arbitrarily impose by subsequent regulations, without necessity, or the demands of public convenience, additional burdens upon the company which are clearly beyond the reasonable exercise of the police power.

### City Ordinance Construed.

In this case an ordinance of the city of Minneapolis construed and *held*, upon the facts set forth in the complaint and admitted by the demurrer, to constitute a contract with the plaintiff authorizing its use of streets, subject only to the reasonable and necessary restrictions of its exercise of the police power.

[1] Reported in 83 N. W. 527, 86 N. W. 69.

## On Reargument.

May 10, 1901.

### G. S. 1894, § 2641—Erection of Poles in Cities.

*Held,* that under Laws 1860, c. 12 (G. S. 1866, c. 34, § 28), as amended by Laws 1881, c. 73 (G. S. 1894, § 2641), telephone companies are given the right to erect poles and wires within the urban ways and streets of this state as well as upon rural highways.

### City of Minneapolis—Authority Given by Charter.

. That the provisions of the charter of Minneapolis confer upon that city no authority to arbitrarily order a removal of such poles and wires, but only the right to regulate the placing of the same in its streets, and to compel the telephone companies to put their wires in subsurface conduits when reason, convenience, or the good government of the municipality requires.

Appeal by plaintiff from an order of the district court for Hennepin county, McGee, J., sustaining a demurrer to the complaint. Reversed.

*F. D. Morgan, A. H. Noyes* and *Geo. D. Emery,* for appellant.

*Billson, Congdon & Dickinson,* filed a brief on the part of parties similarly interested with appellant.

*Frank Healy,* for respondents.

*Oscar Mitchell,* Attorney for the City of Duluth, filed a brief in reply to that filed on behalf of parties similarly situated with appellant.

LOVELY, J.

This action was brought to restrain the city of Minneapolis, its mayor, chief of police, and city engineer, from the threatened enforcement of certain ordinances, as illegal interferences with the rights of the plaintiff in the use of its telephone system and exchanges in that city. A demurrer was interposed by the defendants denying the sufficiency of the complaint to state a cause of action. The court below sustained the demurrer, from which order plaintiff appeals.

The complaint sets forth at length the grievances of which plaintiff complains, and facts which justify its fears that the defendants

will, by the enforcement of two recent ordinances, practically destroy, as it insists, the value of its property, and asks for an injunction to restrain the threatened invasion of its vested rights. It is not necessary to set forth the complaint in full, but we shall call attention briefly to the facts pleaded, which have led us to the conclusion that the demurrer should have been overruled.

The telephone exchange system of plaintiff has a central station in Minneapolis, with substations, switch boards, appliances, and many thousand miles of wire in subsurface conduits, as well as one hundred ten miles of lines stretched on poles throughout the city, connected, through the central station, with each other and with similar exchanges in other cities in the state of Minnesota, as well as the adjacent states of North and South Dakota, Iowa, and Wisconsin. Its general system includes numerous toll lines extending into those states, and comprising more than thirty-five hundred miles of pole lines and twenty-seven thousand miles of wire, with public stations to the number of six hundred or more, all of which exchanges and toll stations are connected with the central office at Minneapolis and with each other, affording intercommunication with more than twelve thousand individual subscribers, and is of great beneficial use to the public generally. This system was completed and has been extended from time to time since 1883, in reliance upon an ordinance of the city wherein the municipality authorized the use and occupation of its streets for such purpose, and prescribed the conditions governing the same. Section 1, page 634, of this ordinance provides that plaintiff

"Is hereby authorized to erect, establish and maintain within the limits of the city of Minneapolis telephone poles, and to stretch and maintain thereon the necessary wires for a telephone exchange system, according to the conditions hereinafter stated."

Section 2 provides that the plaintiff

"Shall file in the office of the city engineer a statement of the streets and alleys of the said city which it has already occupied under permission of the committee on streets."

Section 3 provides that the plaintiff

"Shall file with the city engineer written application for all streets or alleys it may hereafter wish to occupy with its poles and wires," and, further, that "if such application shall be approved by the city engineer and the chief engineer of the fire department, such approval shall be deemed a permission of the city to so occupy said streets and alleys for the purpose above stated."

Section 5 provides that

"In case of a change of grade of any street or pavement so occupied by said company, it shall reset its poles so as to conform to the grade of such street or pavement so changed, and in such manner as the city engineer shall direct, and said poles and wires shall be removed whenever in the opinion of the city council the public interest shall so require."

After the plaintiff had accepted this ordinance, and had established a large part of its system, the city, by an ordinance approved December 10, 1886, required the company to remove its poles throughout a certain district defined therein, embracing the business portions thereof, and including a total area of $^{88}/_{100}$ of a square mile, and to place its wires throughout this district in cables laid in conduits beneath the surface of the streets, which requirement the plaintiff complied with at an additional cost of $300,000. In May, 1899, a further ordinance was adopted, amending the last ordinance, whereby the original underground conduit district was enlarged to ten times its former area by the addition of one hundred eighty-six miles of streets not previously included therein, in which the plaintiff then maintained seventy miles of its pole line system, carrying over three thousand miles of wire, costing $125,000, and supplying its service to more than two thousand subscribers residing in that territory.

The complaint sets forth specifically that in the district included in the last ordinance the lines of plaintiff are so located and constructed as not to interfere with or obstruct the safety or convenience of ordinary travel upon such streets in any way, and that the whole of plaintiff's system as now extended and located thereon is safe and convenient for the public use; also that the new district includes a large area of the city, very much of which is sparsely populated and settled, wherein many of the streets are not opened

*or graded,* and that the expense of complying with such ordinance is so great that the plaintiff cannot conform thereto, but must abandon the maintenance of its system, and will, by the enforcement of the ordinance, be prohibited from the occupation of the streets within such district, *except in accordance with the plan or mode* prescribed, which is not required or demanded by public safety or convenience, and will be so expensive that it cannot be adopted, to the loss of that portion of its system and the value of the business it now conducts therein, to the injury of the entire system and the public by largely curtailing its extent and service. The complaint also alleged that in October, 1899, the city again amended the underground ordinance of 1886, wherein, with reference to this subject, it in terms provided

"That until the 1st of December, 1903, the city council of the city of Minneapolis may permit the erection of such electrical poles, brackets, wires and fixtures within the new territory above described, subject to the right of the city council to cause the removal of such poles, brackets, wires and fixtures    *    *    *    at any time it may order and direct the same to be removed."

Which is claimed to be an unreasonable and arbitrary discrimination in the granting and refusing of privileges before granted and provided for, without regard to the places or persons affected, or the public requirement, or the circumstances upon which the same may be desirable. It is alleged further that repairs, extensions, and renewals of lines throughout the telephone districts of the city are necessary, and must be made from time to time, to keep them safe and efficient for public service. It appears also that after the adoption of the last ordinance the plaintiff has requested from the proper authorities permission to make repairs and extensions of its lines, which privileges have been refused under the alleged authority of the last two ordinances, and plaintiff's servants, in attempting to make the same, have been arrested, and forbidden under penalty of arrest from making necessary repairs, in maintaining such lines.

It is asserted by plaintiff that the action of the city in the respects referred to and in its requirements thus brought under review constitutes an unlawful impairment of and interference with its vested

contract rights, and amounts to a destruction and confiscation of its property by a prohibition of the use and enjoyment of its franchises, for which damages are sought to be recovered, and it is asked that by injunctional order the defendant be restrained from further enforcement of the obnoxious restrictions, or any interference with its legal contract rights and privileges secured under the ordinance of 1883.

In view of the disposition which we deem it our duty to make of this appeal we shall only consider the effect of the original ordinance under which the plaintiff was authorized to establish and maintain its system, in connection with the ordinances of May and October, 1899, under which the rights of the plaintiff, as set forth in the complaint, are and will be violated by the city unless restrained by injunction.

It is claimed on the part of the defendant that under the charter of the city in the exercise of its governmental powers it had the right to enact and enforce the last two ordinances without reference to their reasonableness or effect upon the contract rights plaintiff possesses by reason of its prior acceptance of the ordinance under which its system was established. On the argument to support this theory, counsel for defendant put the issue as a contest between the authority of the common council to rule the city on the one hand, and of the telephone company to violate the restraints of municipal control on the other. Without discussion of principles that are fundamental, it is enough to say that such an issue is not raised by this demurrer. The questions presented doubtless involve the authority of the common council, but we need not cite authorities to support the self-evident elementary principles essential to any government that such authority must not be arbitrarily exercised. It is not a question of "rule or ruin" between either the city or the telephone company. Neither may rule the other. Both are subject to "the law of the land"; and if the ordinance of 1883, which was accepted by the plaintiff, and large expenditures of money made in reliance thereon, is a contract between the city and the plaintiff, the latter cannot wrongfully, and in disregard of justice or reason be deprived of its vested rights obtained thereby,

81 M.—10

without a plain and palpable violation both of the state and federal constitutions.

That the effect of the first ordinance, and the acceptance and expenditures of large sums of money by plaintiff in reliance thereon, established such contractual rights between the parties, we have no right to question, either upon principle or authority. An ordinance of a municipality, surrendering a part of its powers to a corporation to secure and encourage works of improvement, which require the outlay of money and labor, to subserve the public interests of its citizens, when accepted and acted upon, becomes a contract between the city and the corporation which relied upon it, and the grantee cannot be arbitrarily deprived of the rights thus secured. It is protected by the organic law which forbids the impairment of contracts or interference with vested rights without due process of law. Cincinnati v. Smith, 29 Oh. St. 291; Chicago v. Sheldon, 9 Wall. 50; New Orleans Waterworks Co. v. Rivers, 115 U. S. 674, 6 Sup. Ct. 273; City Ry. Co. v. Citizens' St. R. Co., 166 U. S. 557, 567, 17 Sup. Ct. 653; Cincinnati v. Village, 36 Oh. St. 631, 634; City v. Great Southern, 40 La. An. 41, 3 South. 533; City v. Burlington, 49 Iowa, 144; Com. v. City, 97 Mass. 555; City v. Wheeler, 88 Wis. 607, 60 N. W. 818; City of St. Paul v. Chicago, M. & St. P. Ry. Co., 63 Minn. 330, 63 N. W. 267, 65 N. W. 649, 68 N. W. 458. These are but a few of the many authorities which clearly enunciate the rule above stated, the reason for which is founded upon the most obvious principles of justice, as well as sound policy and public necessity; for no one would invest his money to further any plan of improvement for his own as well as the general benefit if the rights to the advantages which he as its promoter expects to derive from its success might be destroyed by the uncertain or capricious inclinations of the governing body of the municipality.

If the city could not arbitrarily violate the contract embraced in the ordinance of 1883, after its acceptance by the company, it must likewise be acknowledged that the plaintiff was subject to such reasonable regulations as might be, by the city authorities, adopted for the good government of the municipality to secure the necessary advantages of urban government by its citizens, and their reasonable rights as such, of which it is the conservator. Unquestionably

there is a continuing right by the city to regulate its local affairs. This right is what is universally known as the police power. It exists intact without reservation in the constitution, and it cannot be surrendered, so that the franchises of private corporations must be conclusively presumed to be acquired with reference to its existence, and contract rights must yield to the proper burdens imposed by growth and development. Elliott, Roads & S. 58, 60. But this extensive power of regulation is not to be exercised at mere whim or caprice. It should be appropriate to and commensurate with the public necessity for the protection and promotion of public morals, health, safety, necessity, or convenience (City v. Burlington, supra); and the application of the police power cannot be extended by the authority which is intrusted with such application to an arbitrary misuse of private rights. Any such unwarranted exercise of authority is unconstitutional and void. State v. Addington, 12 Mo. App. 214; City v. Swift, 113 Mich. 660, 72 N. W. 6.

Recently the subject of municipal control over the erection and maintenance of poles and electric wires in the streets of cities has received particular attention from the courts, and it has been held that an electric company, which has been granted, by the local authorities, the right to use the streets, and has constructed its line in compliance with and in reliance upon the terms and conditions of such grant, cannot be made the subject of new conditions, aside from what may necessarily be required of it by the city in the proper exercise of the police power and the control and regulation of the streets. Com. v. Warwick, 185 Pa. St. 623, 40 Atl. 93; Louisville Trust Co. v. Cincinnati, 47 U. S. App. 36, 22 C. C. A. 334; Levis v. City of Newton (C. C.) 75 Fed. 884; City v. Great Southern, supra; Rutland v. Marble City, 65 Vt. 377, 26 Atl. 635; State v. Mayor, 49 N. J. L. 303, 8 Atl. 123. We need not go further in disposing of the demurrer than to apply the doctrine established by these authorities, for it is easily applied to the facts which are conceded by the demurrer.

The addition of ten times the area through which underground conduits must be constructed at an enormous additional expense, without necessity, is in violation of the contract entered into between the city and the plaintiff in the ordinance under which this

system was established. The requirements imposed by the later ordinance upon the company to build such conduits through ungraded streets in suburban parts of the city and in the open country, are clearly, upon its face, unreasonable, and the claim to exercise such right on the part of the common council of the city at their "will and mere motion" cannot be sustained in the reasonable exercise of the police power, or upon any theory that is consistent with the acquired and vested rights which the plaintiff enjoys under the constitution and the laws. The authority thus demanded by the city touches the limits of absolutism, and, if the right of plaintiff to use its franchise depends upon it, it amounts to an unnecessary destruction of property rights, which no municipality can or ought to exercise, and does not receive the sanction of this court.

We cannot agree with the court below that the provisions of section 5 of the ordinance of 1883, which provides for the removal of poles by direction of the municipality, contains a reservation of authority in the city to enforce the removal of the same at its pleasure. Conceding that the provisions of section 5 extend to the whole ordinance,—which we do not decide,—and thereby authorized the city to order the removal of the poles from streets not being graded, such power cannot be unreasonably and arbitrarily exercised. This provision manifestly implies the exercise of judgment upon such necessities as are always liable to arise in improving the streets, to be enforced only for the public good in the administration of municipal functions, under the authority of the police power. In a proper case, where the city exercises its power of control in the regulation of the use of the streets by the plaintiff, based upon necessity and the interests of the public, that power will be sustained. Beyond that limit it cannot go.

The reservation, in the ordinance of October, 1899, to the city, of the right to grant or refuse the occupation of the streets at its own will, is nothing better than a declaration of a right arbitrarily to grant or refuse the privileges to which it refers. The two ordinances of May and October, 1899, which upon their face and in terms seek to amend the first underground ordinance of 1886, are to be read and construed together as one enactment; for, when such

an amendment is adopted, there are not two separate enactments, the old and the new, but by their union there is produced one law, viz. the ordinance as amended. Black, Interp. Laws, pp. 356, 357. When these ordinances are read together, as they evidently should be, under the facts admitted by the demurrer they are, as a whole, void, for they are clearly open to the objection which is best stated in a leading authority in the highest court of the land upon a similar question:

"They seem intended to confer, and actually do confer, not a discretion to be exercised upon a consideration of the circumstances of each case, but a naked and arbitrary power to give or withhold consent, not only as to places, but as to persons. * *. * The power given * * * is not confined to their discretion in the legal sense of that term, but is granted to their mere will. It is purely arbitrary, and acknowledges neither guidance nor restraint." Yick Wo v. Hopkins, 118 U. S. 356, 6 Sup. Ct. 1064; People v. Mutual, 38 Mich. 154; City v. Great Southern, supra; State v. Finch, 78 Minn. 118, 80 N. W. 856.

We do not intend, in the disposition of this case, to abridge the wholesome right of the municipal government to regulate their internal and domestic affairs within the limits essential to the welfare of their citizens. A city has the right to enact reasonable ordinances, and to enforce them; but it is the conservator, not the autocrat, of the police power. It may originate the exercise of its useful authority, and apply it by specific and valid regulations; but that exercise is not despotic, nor absolute, but is open to review, and an ordinance that upon its face is unreasonable and arbitrary is subject to judicial examination. When it is not bounded by a fair and wise administration of municipal authority, but is unreasonable and arbitrary, it will be declared void, and the municipality restrained from its enforcement. Evison v. Chicago, St. P., M. & O. Ry. Co., 45 Minn. 370, 375, 48 N. W. 6.

To prevent any misunderstanding, we add that the complaint tenders the issue that the city council arbitrarily and without any reasonable necessity enacted the ordinances complained of. The demurrer admits the allegations of the complaint in this respect, and our conclusion is based upon this admission. If, however, the plaintiff on the trial fails to establish such allegation by competent

evidence, it must comply with the ordinance, for it is not to be doubted that the city council has the plenary power to extend the subsurface district wherever, in the exercise of a fair discretion, it decides that public interests require it to be done; but it cannot do so arbitrarily in the premises as alleged in the complaint.

We have not thought it necessary to consider the claim of counsel for defendant that the charter of the city of Minneapolis subsequent to 1883 authorized or warranted the adoption of the ordinance of 1899, if, within the view which we have taken and expressed above, such charter provisions, if they authorize the ordinances of 1899, would be in violation of the constitution; but our examination of the subject does not lead us to the conclusion that there is any such inconsistency between the charter of the city and the vested rights of the plaintiff as justifies such claim.

The order of the trial court sustaining the demurrer is reversed, and the case is remanded for further proceedings according to law.

On May 10, 1901, after a reargument, the court rendered the following opinion:

LOVELY, J.

The public importance of our previous decision upon the control by the municipalities of this state of their streets in the use of the same by telephone companies, as well as the fact that full consideration was not given in the original opinion to the subject of legislative authority for such control, nor to the dependent rights of the telephone companies thereunder, has required a reinvestigation of the whole subject upon reargument. Counsel for the respective parties have not only fully reargued all the questions submitted on the previous hearing, but have filed extensive additional briefs. We have been further aided by the briefs of counsel in a similar case arising in the city of Duluth, which have been of much assistance, and have been fully considered in the result reached.

It was urged for respondent that the court, in its opinion, had assumed that the authority to make the contract, upon which the decision rested, between the telephone company and the city existed, without pointing it out, while in fact no such authority did exist.

It is true such authority was not, in fact, discussed in the opinion. The course on the oral argument by counsel, and the pressing demand for a speedy decision, were to some extent responsible for this omission. The opinion rested principally upon the allegation in the complaint that the city council, in the adoption of two recent ordinances of 1899, had acted arbitrarily, without reason or necessity, after the plaintiff had, at the invitation of the city, upon privileges received, and in consideration of public utility and benefit, expended large sums of money in availing itself of the rights granted in a previous ordinance of the municipality.

We recognize that important questions other than those actually referred to in the opinion are material to the disposition of the order of the trial court, and have regarded it as our duty to reconsider so much of the subject involved, determinative of this appeal but not referred to in the opinion, which we think may be embraced comprehensively in the following propositions:

(1) Did the telephone company have any right from the state to erect its poles and wires in defendant's streets? If so, what were the nature and extent of such right?

(2) Did the city possess a delegated power to control, limit, regulate, or restrict the placing of poles and wires by plaintiff in its streets? And, if so, what were the limitations of such right?

1. What were plaintiff's rights under the general laws of this state? It was claimed that we had overlooked the fact in the previous opinion that under the decisions of this court the city of Minneapolis had no power to make the contract with the telephone company, for the reason that such power must necessarily be derived from the state, where it originally belonged, as an element of its sovereignty, and that the state had never delegated such power to the city, from which conclusion it would necessarily follow that the contract between the city and the company was in excess of authority. The decisions invoked to support this position undoubtedly sustain the view that the plaintiff must necessarily rest its authority upon a prior grant of power from the state. Nash v. Lowry, 37 Minn. 261, 33 N. W. 787; City of St. Paul v. Chicago, M. & St. P. Ry. Co., 63 Minn. 330, 63 N. W. 267, 65 N. W. 649, 68 N. W. 458. It

is not to be questioned that this original element of state control over its public thoroughfares might be legally delegated to municipalities, even to the power of excluding poles and wires entirely from urban streets. In such case the streets cannot be used except by permission of the city, which can restrain such use without reference to public benefit or advantage; and this conclusion presents the necessity of referring to the general legislation of the state, where authority to use such thoroughfares for poles and wires must be found, if it exists.

In 1860 the following statutory provision applicable to telegraph companies was enacted:

"Any telegraph company incorporated or organized under the laws of this state, shall have full power and right to use the public roads and highways in this state, on the line of their route, for the purpose of erecting posts or poles on or along the same, to sustain the wires or other fixtures: provided, however, that the same shall be located as in no way to interfere with the safety or convenience of ordinary travel on or over the said roads and highways." Laws 1860, c. 12, § 1.

This section was incorporated into the revision of 1866, where it continued without change until 1881, when this statute was amended by inserting after the word "telegraph" the words "or telephone." Laws 1881, c. 73 (G. S. 1894, § 2641).

In passing, it may be well to say that this court has never recognized any difference in character between telephone and telegraph companies. "The transmission of intelligence by telegraph or telephone is a business of a public character, to be conducted under public control, in the same manner as the transportation of persons or property by common carriers." Cater v. N. W. Tel. Exch. Co., 60 Minn. 539, 63 N. W. 111. And again, as vigorously expressed in a later opinion of this court (COLLINS, J.), "In these days there ought to be no one to question the statement that the telephone is simply an improved telegraph." N. W. Tel. Exch. Co. v. Chicago, M. & St. P. Ry. Co., 76 Minn. 334, 79 N. W. 315.

In practical application, it is not easy to recognize any difference in the subject-matter (the erection of poles and wires on public highways), in the manner of erecting and maintaining the

same, the public benefits to be derived, or the burdens to be created, although the more extensive use of telephone exchanges has given to the latter improvement a greater utility; but, for the purpose of construing the effect of the legislative enactment referred to, no distinction can be made in favor of telegraph over telephone companies, in their imposition of burdens upon the public thoroughfares of this state. It is well known to every one that the telegraph companies have always had their offices in business centers, at which places only, intelligence has been transmitted and delivered for the benefit of their patrons; and it is likewise as well known that at no time since the first enactment of the statute, in 1860, have telegraph companies directly delivered from their wires messages at private residences on rural highways, while their poles and wires have been erected and continued over the same at all times.

The difference between the use of the streets by telegraph and telephone companies in this respect is worthy of note. For nearly ten years after the amendment of 1881 was adopted, the benefits conferred upon telephone companies were not used upon rural highways, but to a great extent on city streets. It was not until after 1890 that the long-distance telephone, for which such use would have been available, was known in this state. Within a very short time thereafter the cities and villages throughout the country were connected, largely through the imposition of the servitude previously enjoyed only by telegraph companies, and such highways made subservient thereto. These historical facts, of which the court must take notice, are to be borne in mind, to appropriately apply the statute; for if the legislature, by the use of the words "roads" and "highways" therein, intended to adopt the popular sense in which these words were understood, such intention must prevail, and be held to have given authority to the plaintiff to erect its poles and wires within the highways of defendant and other cities throughout the state, for the legislature must be understood to mean what it has plainly expressed. Where the legislative intent is plainly expressed, so that the act, read by itself, or in connection with other statutes pertaining to the same subject, is clear, certain, and unambiguous, the courts have only the simple and obvious duty to en-

force the law according to its terms. This is elementary. Sutherland, St. Const. § 237.

It is contended by defendant that such was not the legislative intent in the enactment of the amended statute of 1881, which gives the same right to telephone as to the telegraph companies, but that a distinction was intended, and must be now applied, in construing this statute, as between urban and rural highways, limiting such use solely to country roads.

The definition of a word in a statute need not be absolutely decisive of its meaning in all cases. The history of the act, its general purpose, the mischief to be cured or benefits to be obtained, according to general understanding, as well as the sense to be derived from its connection in the same or other statutes, may be essential to aid courts in the duty of construction. But, in a legislative enactment that has continued for many years without cavil or question, the first source of inquiry is the popular meaning of the words employed to express its sense, which furnishes the natural and reasonable, as well as the primary, legal source of interpretation; and for authoritative definitions we necessarily turn to the standard dictionaries of our language. The popular meaning of the word "road" is defined in the Century Dictionary as "a public way for passage or travel; a strip of ground appropriated for travel, forming a line of communication between different places; a highway, hence any similar passage for travel public or private." The same authority defines the word "highway" as "a public road or passage; a way open to all passengers by either land or water." The approved legal definition of "highway" is "a passage or road through the country, or some parts of it, for the use of the people. It is the generic name for all kinds of public ways." Bouvier, Law Dict., "Highways." The word "highway" has been used in its generic sense extensively in decisions of the courts to which our attention has been directed in the briefs and arguments of counsel, and it does not appear from such use that any distinction has been made in the application of the word "highway" to a country road which would distinguish it from an urban street or way.

A very distinctive recognition has been made by our own court of

the use of the term "highway" as applicable to city streets, whereby, in G. S. 1878, c. 13, § 47 (G. S. 1894, § 1832), it is provided that

"When any road or portion thereof shall have been used and kept in repair, and worked, for six years continuously as a public highway, the same shall be deemed as having been dedicated to the public, and be and remain, until lawfully vacated, a public highway."

Under this section, notwithstanding its reference to the town in which the road is located, the same has been considered as applicable to incorporated municipalities. Village of Benson v. St. Paul, M. & M. Ry. Co., 62 Minn. 198, 64 N. W. 393; Hall v. City of St. Paul, 56 Minn. 428, 57 N. W. 928; Elfelt v. Stillwater St. Ry. Co., 53 Minn. 68, 55 N. W. 116. We might collect authorities without number to show that this term has been applied in judicial decisions, in its generic sense, to city streets. The result of such investigation leads to the conclusion, seemingly too plain for serious discussion, that the word "highway," in actual use, embraces city streets as well as country roads, furnishing the strongest inference that it was intended to apply to both, and that, while the word "street" is more often used than "highway" to designate an urban way, yet it was in this statute used for both purposes. We cannot, therefore, by looking through the charters of different cities where the words street and highway are used, respectively, in reference to urban thoroughfares, and by comparing the result, necessarily determine any distinction in this respect; for where a word of general import covers two classes, and another only one, the obvious and sensible inference would be that the general term was intended to embrace both, and we do not discover from the reading of the statute under consideration any intention to restrict or limit the general meaning of the word in this respect.

The suggestion that the proviso limiting the erection of posts or poles so that the same shall "in no way interfere with the safety or convenience of ordinary travel on or over said roads or highways" is more applicable to rural than urban streets is of little significance, or that such restriction is ordinarily a subject of municipal control under charter provisions has no persuasive force in construing into this law the distinction urged. Ordinary travel takes place

on city streets as well as rural roads, and the proviso would go no further than to secure protection when needed. Besides, at the time this statute and its proviso were first adopted the population of Minneapolis, now the largest city in the state, was less than three thousand people; the state was in its infancy, and encouraged all public improvements with great liberality. If the words "ordinary travel and convenience," in any popular sense, are more applicable to country than city places, which is not clear, the restriction in the proviso at that time would apply to a greater part of the area included in the cities of the state with as much force as to any country road. Since it cannot be disputed that a city street, in the popular sense, is a highway, and that the plaintiff, under the statute, may use highways under the limitation so as not "to interfere with the safety or convenience of ordinary travel," it follows that the statute must be treated as having meant what it said. A more critical examination of its language than is furnished by its ordinary reading is not useful or even possible. A statute must be treated as a living thing; oftentimes it is dissected as if it were a dead letter. Our duty is not to make an autopsy upon its remains, but sensibly to discover what it means. We apprehend that the reasons which led to its enactment, as well as the manner in which it has been treated by our people and the legislature, if consonant with its sensible meaning, should prevail. Any other course would require us to usurp functions we do not possess. It is our duty to construe the statute, not to amend or repeal its provisions.

If we recur again to the historical facts which assist in defining the meaning of this law, we find that, so far as the placing of poles and wires on highways is concerned, that right was created by legislative action more than forty years ago, and it has continued in force and materially aided in the growth of this great commonwealth. The only change of such right, until 1893, has been an extension of its benefits. For twenty years the telegraph companies of this state applied its terms comprehensively to cover their necessities upon all public ways, both rural and urban, when the telephone companies were given the same benefit. For ten years thereafter, at least, the telegraph companies exercised the same privileges as before, while the telephone companies during the intermediate pe-

riod between the amendment and the origin of the long-distance service derived no other benefits than within the urban districts to which they confined their business, and to which it is now claimed the statute did not refer. In other words, the telephone companies were using, under the benefits of this statute, without apparent objection, the places where it did not, on defendant's theory, apply, and did not use the only places where it did apply, while the telegraph companies were using both for the same purpose. The inference that follows is inobvious, and lies upon the surface: The people understood the law to mean what it said, and had found it sufficient to meet the necessities of the people of this state, and consonant with the demands of growth and progress, and for thirty years and more its benefits were accepted as to both kinds of companies, and it was not amended or changed.

The strongest argument in support of defendant's contention that there was a reserved legislative purpose to exclude urban thoroughfares from the benefits of the statute is that such a restriction has been practically placed upon the statute by the plaintiff itself. It is urged that plaintiff and others similarily situated have repeatedly sought concessions from municipalities, particularly from defendant, at variance with the right to use its streets, which it now insists upon; that the privilege of placing poles and wires in the streets has never until the present time been demanded as a right, but has been accepted (as under the ordinance of 1883, set forth at length in the former opinion), and the fact that the plaintiff has recognized the power of the city to control this subject is to be given weight; and this, to a certain extent, is true, although to what extent, and how far such privileges have been asked for and received, in the absence of any reliable data, it is not easy to determine.

There is some logical force in this claim, although it cannot be deemed controlling, nor sufficient to overcome the spirit of the statute expressed in its literal terms; for it is in opposition to the source of the real authority to construe the law, which is judicial, and vested in the courts. If the meaning of the words of the statute were doubtful, the interpretation which the telephone company and the city have placed upon such meaning might be more weighty; but where there is no doubt, or private policy and self-interest dic-

tate the action of either party, such argument is of very little force. Were it clear that no such authority to use urban ways had been vested in the telephone company by the general statute, its assertion or assumption of such right would not create it, or, if a reasonable construction would not permit such a view, the plaintiff could not determine the question by its own acts. It would still be for the courts, rather than the plaintiff, to construe the meaning of the law.

If the views we have expressed above are correct, the actual right to use the highways of the state, either in cities or upon country roads, subject to necessities of ordinary travel, was conferred upon plaintiff. The defendant has for years assumed control itself of this right, and contracted with the plaintiff on that basis, notwithstanding the statute; but the city now disclaims that it had such right, and it would be hardly a conclusive argument for the plaintiff to say, in answer to this claim, that the city did not have such right, because it had construed the statute against itself in this respect, by adopting the ordinance of 1883, and could not repudiate its ultra vires acts. The peculiar nature of the telephone business is such that the plaintiff and defendant do not stand upon equal grounds in dealing with each other, and, notwithstanding the provisions of the statute authorizing the use of city streets, the exactions of the municipality might well be such that any hostile treatment of the plaintiff might greatly injure its business and deprive it of the benefits to be derived therefrom; and it is quite easy to see how the plaintiff might well desire to avoid friction with or antagonism from the city in the enjoyment of its franchises. Again, if the city, as we conclude further on, had the reserved power of regulation, in the interest of public convenience and necessity, in the placing of telephone poles and wires in particular streets or in subsurface conduits, such right would justify action on the part of the city that would necessitate concessions that the city would be authorized to make in formal respects, and the argument based upon the practical construction of the statute falls to the ground.

We have not overlooked two recent enactments affecting the subject. In 1893, for the first time, a restrictive proviso was incorpo-

rated into an amended section of G. S. 1878, c. 34, § 1 (G. S. 1894, § 2592), providing for the organization of corporations, to the effect that no franchise should be granted to telegraph or telephone companies that would authorize them to place their poles and wires in city streets without permission of the municipality. Laws 1893, c. 74. And to the same effect is Laws 1899, c. 51. The plaintiff was organized as a corporation in 1878. It obtained the benefits of the act of 1860, above referred to, in 1881, which became a contract between the state and the plaintiff by the acceptance of the same. Hence the proviso in the law of 1893 and 1899, being prospective, could not impair rights that had become vested, because forbidden under the clearest prohibitions in the state and federal constitutions; and it is not claimed that these statutes did so, nor is it possible to treat the latter proviso as a legislative interpretation of the original act of 1860, which had been continued in force up to that time without change, unless the inference follows, for what it is worth, that these restrictive provisions were enacted to impose upon companies organized in the future an obligation which was by the legislature not supposed to be expressed in any previous statute. This inference favors plaintiff's contention.

As a result of this review of the subject, we are led to the conclusion that the plaintiff had a right to use the streets of the city, under proper regulations and restrictions (referred to in the original appeal) by the municipality. What such power of regulation in the city imposed in its relation to the plaintiff is still to be considered. Since the first argument in this case the general statute (G. S. 1894, § 2641) has been judicially construed by the United States circuit court of this district, and the conclusions expressed above find authority therein, as well as the necessary deduction that any ordinance of the city interfering with or impairing the vested right thus conferred upon the plaintiff by the state violated constitutional rights and was invalid. Abbott v. City of Duluth (C. C.) 104 Fed. 833.

2. It still remains to consider such provisions of the city charter as affect the subject under the inquiry, did the city possess a delegated power to limit and regulate the placing of poles and wires by

plaintiff in its streets; and, if so, what were the limits upon such right? The provisions of the defendant's charter germane to this subject at the time when the ordinance of 1883 was enacted by the common council in the exercise of the delegation of power to defendant over its streets gave it the right, under subd. 6, § 5, c. 4,

"to prevent the encumbering of streets, sidewalks, alleys, lanes, public grounds, or wharves with carriages, carts, wagons, sleighs, boxes, lumber, firewood, posts, awnings or any other materials or substances whatever";

and by subd. 31, § 5, c. 4, the power

"to remove and abate any nuisance, obstruction or encroachment upon the streets, alleys, public grounds and highways of the city";

and by section 1, c. 8,

"the care, supervision and control of all highways, streets, alleys, public squares and grounds within the limits of the city."

Such was the power delegated to the city council to adopt the ordinance of 1883 (set forth at length in the former opinion), which conferred upon the plaintiff the right to use and occupy the streets and alleys of the city with its poles and wires. Nothing in the provisions above quoted conflicts with the power to pass such ordinance. On the other hand, under such general provisions, even in the absence of the general statute (G. S. 1894, § 2641), it might be held that sufficient power was so delegated for that purpose. In a recent case decided by the United States circuit court of appeals for this circuit, it was held (Sanborn, J.), under a statute where the city of Colorado Springs was empowered to regulate the use of its streets, to provide for the lighting of the same, to pass all ordinances and to make all rules and regulations demanded or necessary to exercise those powers, that "it had the implied authority to grant the rights and privileges to construct a power house to generate electricity on its public grounds," etc. Pikes Peak Power Co. v. City of Colorado Springs (C. C. A.) 105 Fed. 1.

Thirty-four days after the passage of the ordinance under which the city attempted to grant the right to the telephone company to erect its poles in its streets, the charter of the city was amended

by adding to subd. 42, § 5, c. 4, the following authority to be exercised by the council:

"To regulate and control or prohibit the placing of poles therefor, and the suspending of electric and other wires along or across the streets of said city, and to require any or all already placed or suspended either in limited districts, or throughout the entire city, to be removed or to be placed in such manner as it may designate beneath the surface of the street or sidewalk."

This provision does not declare that the power therein conferred is exclusive in the city, nor that the right to remove poles and wires in the streets is to be exercised by the. city arbitrarily. If the general statute (G. S. 1894, § 2641) is controlling, as we have held above, this provision should be construed so as to harmonize with that statute, and not given such a construction as would give absolute power to the city to remove wires and poles without reason or necessity, for such a view would clearly interfere with plaintiff's vested rights; or if, as we are led to believe, there was authority under the previous provisions of the charter in force at the time the ordinance of 1883 was enacted and accepted by the plaintiff, it follows, as held in Pikes Peak Power Co. v. City of Colorado Springs, supra, that an ordinance of a city passed under legislative authority, within the provision of the federal constitution, "cannot be repealed by later ordinances which would be so clearly a violation of section 10, art. 1, which prevents the passing of a law impairing the obligations of a contract, and the fourteenth amendment to the constitution, which forbids the taking of property without due process of law" (that, as held in that case), "no argument to the contrary would be worthy of a moment's consideration."

So far we have considered this question with reference to the rights of the plaintiff, upon the allegations of the complaint well pleaded that allege that defendant was arbitrarily attempting to interfere with plaintiff's rights; but the provisions of the city charter which we have quoted do possess a force and vitality in authorizing such control and regulation of plaintiff's business by the city that they must not be overlooked. We think much misunderstanding has arisen from the previous opinion, through a failure to realize what was actually determined. We have not held, and do not hold,

that the city had the power to confer upon the plaintiff vested rights irrevocably to occupy its streets, in violation of any reasonable right therein by the city. We hold that the only power delegated by the state to the city under any of the charter provisions referred to is the power of regulation, and the necessary control incident to such power. We held in the former opinion, and now hold, that the only contract entered into by the city with the defendant was with reference to the manner and method of placing its poles and wires. Such contract was within the police power of the city, and, the defendant having acted upon the contract by the ordinance of 1883 as to how it should place its poles and wires, the city cannot, without reasonable cause, in the exercise of its power of regulation, revoke its contract as to such matters, and order a different arrangement.

The power of regulation, or the police power, as there designated, belonged to the state, and was delegated to the city in its charter; and we think that the charter provisions referred to fully recognize its beneficent authority, which should be exercised in reason and judgment for the best interest and welfare of the municipality, and secures all that is essential to a proper and reasonable control of the plaintiff's business. It is not to be assumed that the legislature, in delegating such powers, intended to violate the organic law, or (what would be, perhaps, as bad in its practical effect) to invest the defendant with the power to confer a monopoly in the use of its streets to a favored corporation, which is the logical and necessary result of defendant's claim. If the claims of the city are well founded upon the issue raised by the demurrer, it can grant a right today, and deprive the party to whom it is granted of such right tomorrow. If it can confer the privilege upon the plaintiff of placing overhead wires on the streets, and immediately thereafter compel the plaintiff to replace the same in subsurface conduits in rural neighborhoods, where there is no reason or necessity for such change, which purpose is admitted by the demurrer in this case, it might immediately thereafter compel the removal of the wires so placed in subsurface conduits. Nor is such a result impossible of conjecture. Oscillations of power in local government do not always vibrate from the same center, for history is full of illustrations

to show that the guardians of the people may become their oppressors, through injurious monopolies that deprive the people of their privileges. The safeguards of the constitution are the ultimate refuge from such usurpations, and it cannot be believed, when we consider the extreme and justifiable jealousy which has existed on the part of the lawmakers to guard against the abuses of power, that they could have intended to confer by doubtful terms an arbitrary right upon any municipality in this state unreasonably to deprive its citizens of the benefits of progress or to grant monopolies.

The solution of the question involved in this case is not difficult, and is consistent with every reasonable interest that belongs to the people of the city of Minneapolis. The plaintiff has the right to use its streets in the way prescribed, but such right is subject to regulation; and if the use of any street for overhead wires, or any other placement of its lines, is injurious to public safety, convenience, comfort, or utility in the management of city affairs, or inconsistent with reason, order, and good government, the city has the power, under the law and its charter provisions, to compel a removal of such poles and wires from its streets, and compel them to be placed in subsurface conduits, or to otherwise regulate the business of the company so that the use of its streets shall not interfere with the rights of its citizens, but subserve their welfare, in the inestimable service which the telephone renders to commerce, civilization, and the happiness of its people. This case comes here upon statements in the complaint as to what the city is attempting to do that may or may not be true. We are required, upon the admissions made by the defendant itself in its demurrer, to accept such statements; and, accepting them, we have simply determined that what has been well pleaded and alleged shows an exercise of arbitrary and absolute power on the part of the city, and cannot be sustained. We have determined no facts, but only assumed that to be true which defendant has admitted. In the tribunals of the law, within the jurisdiction where this plaintiff and defendant are conducting this contest, there is no doubt, it seems to us, but that a determination should be reached upon the actual facts, with which no

fault should be found by anyone who cares more for the benefits of good government and the best interests of the people than for the assertion of arbitrary rights.

We have noted the point that the defendant claims that injunction is not the proper remedy; that it was the prerequisite duty of the plaintiff to have applied for permission to place its poles to the city engineer, and, on his refusal, to seek its rights through mandamus. This is not a case where ministerial officers have refused to perform a duty imposed upon them by law, but where the city itself, by the enactment of ordinances, prohibits its officers from performing such duties. In such a case injunction is clearly the proper remedy. What we have stated above, in addition to what is held in the original opinion, must be deemed a disposition of the claim that section 5 of the ordinance of 1883 gave the city the arbitrary power to remove poles at its pleasure, and we adhere to our former conclusions in this respect.

. While we have not noticed particularly all the points suggested by counsel on the reargument and briefs, they have all been fully considered, and we have covered the propositions which seem to us to be decisive; and have reached the conclusion—which seems to us as clear as can be realized in any disputed legal controversy—that the power to place poles and wires in the streets of municipalities in this state has been conferred upon the plaintiff by the legislature; that the question as to the manner in which this power should be exercised to meet the demands of convenience and necessity was within the authority of the city; that the ordinance of 1883 was, to a certain extent, so far as manner and form, at least, are concerned, the subject of contract obligation; and that the subsequent ordinances of May and October, 1899, as alleged in the plaintiff's complaint and admitted by the demurrer, impose such burdens upon the plaintiff as to impair their legal contract rights, and to that extent must be restrained, leaving the question of fact yet to be determined, whenever raised in the proper manner, whether the provisions of those ordinances, or of any other that may be adopted, are within the limits of wholesome and proper municipal regulation.

For the reasons stated above, we abide by the former opinion of

this court, and the order sustaining the demurrer is overruled, and the case remanded.

START, C. J. (dissenting).

I cannot assent to the conclusion reached by the court upon several vital questions in this case. It is not my purpose, however, to discuss them in detail, but simply to state my conclusions.

I dissent from so much of the decision as is to the effect that telephone companies are given, subject only to proper exercise of the police power, the right, by G. S. 1866, c. 34, § 28, as amended by Laws 1881, c. 73 (G. S. 1894, § 2641), to use the public streets of the municipalities of the state, without the permission of the corporate authorities, for the purpose of erecting and maintaining their posts and wires therein, provided such posts be so located as in no way to interfere with the safety or convenience of ordinary travel in such streets.

While the word "highways," in its most comprehensive meaning, includes the streets of a municipality, yet in its popular meaning it does not. Wherever the word is used in a statute, its meaning depends upon the legislative intent, but no inflexible rule can be laid down for determining such intent. It must be gathered from the language used, the subject-matter and the purpose of the statute, and existing legislation to be affected by it. It seems unreasonable to conclude that the legislature intended by this statute to repeal, pro tanto, existing special laws giving to the municipalities of the state the control of their streets, and to confer the perpetual right upon telegraph and telephone companies to enter upon any and all of the streets of such municipalities, without consent of the governing body thereof, and erect and maintain therein their poles and wires, subject to no control or limitation except such as is incidental to the exercise of the police power. If such was the intention of the legislature, it seems reasonable to believe that it would have been clearly expressed by the use of the word "streets" in connection with the words "roads and highways," as was and is the legislative custom in cognate cases, as evidenced by numerous statutes. It seems clear to me that the word "highways" was used in this statute in its restricted sense, as referring only to rural highways,

and not to the streets of the municipalities of the state. In any event, there is more than a fair doubt as to whether it was intended by the statute in question to grant any rights in such streets; hence the doubt must be resolved against all parties claiming such rights, for public grants, unlike private ones, must be construed strictly against the grantee.

I am of the opinion that the plaintiff has no right to maintain its poles and wires in the streets of the defendant city by virtue of G. S. 1894, § 2641, but that its rights therein depend upon the charter provisions and ordinances of the city. The plaintiff, by virtue of the existing charter provisions of the city, on January 24, 1883; the city ordinance of that date, referred to in the record as "Ordinance A"; the amendment of the charter 34 days thereafter (Sp. Laws 1883, c. 3, § 13); and by its acceptance of the ordinance,—acquired a qualified contract right to maintain its telephone exchange system in the streets of the city. The right, however, to have the poles and wires removed from the surface of the streets, and placed underground, whenever, in the opinion of the city council, public interest so required, was expressly reserved, as a part of the contract. This stipulation is something more than the mere right to regulate and control the streets of the city and the business of the plaintiff in the exercise of the police power. That right is inalienable, and need not be reserved. While the city council, by virtue of this provision of the contract, cannot confiscate the plaintiff's property, nor wholly exclude it from the streets of the city, yet it does commit the question as to when, and to what extent, public safety, convenience, and comfort require that the defendant's poles should be removed from the surface of the streets, and its wires placed underground, to the discretion, judgment, and decision of the city council. It is the arbitrator agreed upon to determine the question, between the city and the plaintiff, whether public interests at any particular time require that the wires be placed below the surface of the street; and its decision, when made, whether it be correct, wise, or just, is conclusive, unless it has acted in the premises arbitrarily or dishonestly. When, as in this case, the city council passes an ordinance requiring the wires within a designated district to be placed in sub-

surface conduits, the ordinance, whether a proper exercise of the police power or not, is valid, and must be obeyed, unless the plaintiff can establish by satisfactory evidence that the city council did not enact the ordinance in the exercise of a fair discretion, but arbitrarily or dishonestly. The allegations of the complaint, liberally construed, are sufficient to bring the case within the rule stated, and upon this ground alone I concur in the conclusion of the court that the complaint states a cause of action.