Summers, J.
It is averred in the petition “that the Public Landing of said city is about one thousand feet in length, east and west, and that its grade from north to south descends to the river quite abruptly; that the vehicular traffic which goes upon and down said Public Landing is very heavy at all times, and that all merchandise coming into the city at such Public Landing and departing therefrom, must be hauled up and down this Public Landing on a heavy grade, and that the elevated structure about to be erected by the defendant railroad consists of forty or more bents or supports of steel, which are only 25 feet apart, from center to center, and whose 'actual clearance for vehicular traffic is not over 22 J4 feet at the ground, and not over 23 feet higher up; and that the vertical clearance or headway of these spans at the east and west ends of the Public Landing are only 12 feet, and towards the center of said Public Landing the clearance height at the highest point is only 13 feet tea inches; and such structure will-be of such height, character and size, and the steel supports so nu *495 merous and so situated as to be a public nuisance and greatly impede and obstruct the public travel on said landing.
“Plaintiff further says that owing to the grade on the Public Landing, the vehicles which use the same can not go straight down or come straight up the same, but must travel thereon obliquely in order to accomplish the ascent or descent; and that the elevated structure contemplated by defendant company is placed near the top of the bank of the river, with the bents or supports situated-at right angles to the river, so that travel as it approaches said viaduct, is compelled to go due north or south in order to avail itself of the full width of the span, or else approach and pass under said structure at an angle whereby the space for passing is greatly reduced.
“Plaintiff further says that the support or bent in Walnut street and the numerous bents or supports in Vine street, whereby less than 12 feet space is provided for vehicular traffic, will so obstruct traffic through said streets as to cut off the public from the use and enjoyment of the same to a material degree.”
And it is further averred “that the method of construction over said streets and public grounds proposed by defendant railroad company will be such as to interfere with the ordinary travel over said streets and the Public Landing, will be á nuisance, and will seriously and permanently obstruct travel over said streets and grounds and exclude the public and the plaintiff from the' use and enjoyment thereof, to the irreparable damage of the public and this plaintiff.”
.The prayer of the petitioner is for a temporary *496 restraining order, and that upon a final hearing the ordinances may be declared null and void, and that a permanent injunction may issue to prevent the erection of the structure upon the streets and alleys and public landing, • and for a mandatory .order requiring the removal of the structures already 'erected.
The hearing of the motion to dissolve occupied the attention of the court for quite a number of days, and a- bill of exceptions containing more than six hundred pages of testimony was taken. ■ There is no finding of facts, and the answer of the railroad company was not filed -until aftér the overruling of the motion' to dissolve the temporary in-' -junction, and the case has not been heard in the trial court on the merits. Under a former ruling of this court (Burke v. Railway Co., 45 Ohio St., 631) an order overruling a motion to dissolve an injunction is-an order affecting a substantial right made in a special, proceeding which may be reviewed on error, and counsel for the city contend that where that is the only error complained of the only question presented is whether the court used its legal discretion in allowing the injunction .to remain in force until the case can be heard upon the merits, while counsel for the railroad compány contend that in view of the fact that the city council has hot repealed its ordinances granting the right, nor directed the suit to be brought, ■and in view of the delay in bringing it and the great expenditure of money that has already been made in the prosecution of the world.authorized by the ordinance, the city is estopped, and that in view of the suspension of the work the case. was' brought here in .this way in the exp'ec *497 tation on the part of counsel for ail parties of an early decision as to the right of the. railroad company to proceed with the work. Ordinarily we should not consider the questions involved further than necessary to determine the particular error assigned on the record, but since in the view of the law entertained the whole controversy may be determined on the record before Us we shall consider them so far as necessary to the determination of the case.
Public streets, squares, landings and grounds are held in trust for the. public, and being so held they are, for the uses for which they were dedicated or acquired and subject to the property rights of abutting owners, under the absolute control of the legislative power of the state. - In this, state the care, supervision and control of .public highways, streets and grounds, in cities is delegated to the council, but notwithstanding this delegation of general power over them, the state, now and since 1852, has in express terms delegated to cities the power to grant to railroad companies the right to occupy or incumber and use them, or in express terms has made the right subject to agreeing with the municipal authorities as to the manner in which they are to be occupied, so .that the general power, of care, supervision and control, that has been delegated does not carry with it the power to grant such right, and a grant by the council of a city of permission to occupy the. streets and public grounds does not confer such-right.
Section 3283, Revised Statutes, originally-passed in 1852, provides that if it be necessary in *498 the erection of any part of a railroad, to occupy any public road,- street, alley, way or ground of any kind, or any part thereof, the municipal or other corporation, or public officers or authorities, owning or having1' charge thereof, and the company, may agree upon the manner, terms and conditions upon which the same may be used or occupied, and, if they be unable to agree, that the company may appropriate so much as may be necessary for the purposes of its road; and then provides “but every company which lays a track upon any such street, alley, road, or ground, shall be responsible for injuries done thereby to private or public property lying upon or near to such ground.” It will be noticed that the language of the section is “every company which lays a tract upon any stick ground.” 'At that time elevated roads were unknown and the occupancy that was contemplated was merely the laying of the tracks upon the surface of the ground, and was an occupancy that did not exclude the public from the use of any part of the street. Accordingly in The Lake Shore and Michigan Southern Railway Co. v. The City of Elyria, 69 Ohio St., 414, where this section was under consideration, it is held that the section does not authorize a city or village council to agree with a railroad company for the permanent use and exclusive occupation of a public street with abutments to support an overhead crossing. of a railroad, and that a city council is without authority to grant such a right unless authorized by statute in express terms. That case is decisive of this unless power to make the grant in question has been elsewhere or since delegated. Counsel contend *499 that the public landing is a public highway and that power to make the grant has been since that decision expressly granted, and reference is made to an act passed May 3, 1904, 97 O. L., 546, section one of which provides: “Except as in this act elsewhere provided, all crossings, hereafter constructed whether of highways by railroads or of railroads by highways, shall be above or below the grade thereof;” and to Section 3337-1,’ Revised Statutes, as amended April 23, 1904, 97 O. L., 301; that section as originally passed in the year 1889 was entitled “An act to protect travelers on streets and highways” and, so far as it is material to notice it, was as follows: “Sec. 1. It shall be unlawful for any person, company or corporation owning or operating any railroad, crossing, or that may hereafter cross, over and above any street, less than seventy feet in width, in any city in this state, at an elevation above such street, sufficient to permit persons to pass and repass along such street beneath such railroad crossing, to place or cause to be placed, or to suffer or permit to be or remain in such street, beneath such railroad crossing or bridge, any pier or other stay or support' for such crossing’ or bridge,” and the amendment added these words: “unless the placing and maintaining of the same be authorized by the city in which such crossing is situated, by ordi-' nance duly passed;” and to Sections 3337-170 and 3337-17&, which provide that any municipal corporation may raise or lower or cause to be raised or lowered the grade of any street or way above or below any railroad tracks therein and may require any railroad company operating a railroad in such municipality to raise or lower the grade *500 'of its tracks, or require the railroad company to construct ways or crossings that are to be passed under its tracks.
As to the last two sections it may be observed that they do not purport to confer power to grant rights to occupy streets by railroads but power to change existing occupancy, and that none of the provisions of any of the sections relates to public grounds but only to streets-and highways. When a public common or square is opened and used for purposes of public travel it may be likened to a highway, and under such circumstances public commons have in some instances been so called by the courts, but in Langley v. The Mayor and Trustees of the Town of Gallipolis, 2 Ohio St., 108, where the contention was that the public square was a highway and that, therefore,1 the town could not rightfully enclose it, Bartley, C. J., says: “Although the manner of dedication, and the principles and rules of property applicable to public highways and public squares, may rest upon the same ground, yet the use and purpose of each is different and clearly distinguishable from the other. The easement of a public highway, the legal'incidents of which are well defined, comprehends the rights of all individuals in the community, whether .upon foot, on horseback, or' with any kind of vehicle, to pass and repass, together with thé right of the public to do all the-acts necessary, to improve it, .and keep it in repair. But the use and beneficial purposes of a public square, or common, in a village or city, where no special limitation or usé is prescribed by the terms of the dedication, are entirely different from those of a. public highway. Such a place, *501 thus, dedicated to the public, may be improved or ornamented for pleasure-grounds and amusements for recreation and health; or it may be used for the public buildings, and place for the transaction of the public business of the people of the village or city, or it may be used for purposes both of pleasure and business. Any such appropriation may .be made under the -direction and control of the municipal authorities; but the place must, for the purposes of the dedication,remain free and common to the use of all the public. And an appropriation to the purposes of a mere public highway, or to the private and individual use and purposes of any lot-owner or particular class of lot-owners in the village or. city, of ground dedicated as that in question, would be inconsistent with the objects of the dedication, and a plain diversion from its appropriate and legitimate uses.”
But if any doubt remains, as to the absence of any delegation by the legislature of power to make such a grant, it is immaterial, in view of the fact- that the legislature itself does not possess' the power. In The President, Recorder and Trustees of the City of Cincinnati v. The Lessee of White, 6 Peters, 431, in an action in ejectment to recover possession of a part of this public landing, it is said: “The equitable owners of a tract of land on the River Ohio (the legal title to which was granted to John Cleves Symmes, from whom they had purchased the land before the emanation of the patent from the United States.) proceeded in January, 1789, to lay out on part of the said tract a town, now the city of Cincinnati. A plan was made and approved of by all the equitable *502 proprietors, and according to which the ground lying between Front street and the river was set apart as a common, for the use and benefit of the town forever, reserving only the right of a ferry; and no lots were laid out on the land thus dedicated as a common. Afterwards, the legal title to the lands became vested in the plaintiff in this ejectment, who, under the same, sought to recover the premises so dedicated to public uses. Held, that the right of the public to use the common in Cincinnati must rest on the same principles as the right to use the streets; and that the dedication made when the town was laid out, gave a valid and indefeasible title to the city of Cincinnati.”
And it is further said that this common or landing was dedicated for the public use, and the convenience and accomodation of the inhabitants of Cincinnati.
In the opinion by Bartley, C. J., in Langley v. The Mayor and Trustees of the town of Gallipolis, supra, he says: “In the Commonwealth v. Alburger et al., I Whart., 469, a very full inquiry was instituted into the rights and uses connected with certain public squares in the city of Philadelphia; and the court, by Sergeant, Justice, say: ‘When property is dedicated or transferred to public use, the use is indefinite, and may vary according to circumstances. The public not being themselves able to manage or attend to - it, the care and employment of it must devolve upon some local authority or body corporate as its guardian, who are in the- first instance to determine what use of it, from time to time, is best calculated for the public interest, subject, as chari *503 table uses are, to the control of the laws and the courts, in case of any abuse or misapplication of the trust. The corporation has not the right to these squares so as to be able to sell them, or employ them, in a way varient from the object for which they were designed.’ ”
In Le Clercq et al. v. Trustees of the town of Gallipolis, 7 Ohio (Part 1), 218, the trustees of the town of Gallipolis were perpetually enjoined from executing a power conferred upon them by an act of the legislature, 32 O. L., 120, to lease a part of the public square and to apply the avails to the improvement of the landing, and it was expressly held “Where land in a town has been dedicated as a public square and used as such, the legislature can not authorize the town corporation to change its character.” In the opinion Lane, J., says: “The fee of lands dedicated to public objects sometimes passes directly to the corporation for whose use it is intended, and is sometimes held by a corporate town, or by a county, in trust for the uses designated. In the first case, as where land is given to a town for corporate purposes, a vesting by the present statute, 29 Ohio St at.,- 351, or where land is acquired by a county by purchase, or where given for county objects, a vesting by section 4 of the act of 1800, 2 Ter. Laws, 43, an absolute estate is held by the corporation, which they may alien, 5 Ohio, 204-, and third persons are not permitted to interfere with the management of their agents, 6 Ohio, 101. But when such corporation take as trustees, to hold to prescribed uses, the cestui que use acquires a vested estate, the enjoyment of which may be obtained in chancery. In this case *504 the land was either vested in the town' for the use of the inhabitants by the general acts of - dedication, or it passed to the county by the statute, to be held for this use.” ■
“In the case, then, before us, wherever the fee was vested it was held in trust as a public square, for the use of the inhabitants of the town.. It was valuable property, appurtenant to the estates of the lot-holders. The statute professes to autho^ rize.the defendants to apply the land to a different purpose, without the consent <pf those interested, from the surmised greater convenience of the citizens. Our course of. reasoning has led us to the conclusion, that the act confers upon the defendants no power to divert this property from ‘its original use. Perpetual injunction awarded.”
• This case is cited with approval and the same principle applied in the Board of Education of the Incorporated Village of Van Wert v. The Inhabitants of said Town, et al., 18 Ohio St., 221.
This property was not- given to Cincinnati to be used or dispose of as it might determine to be for its best interests, but it was dedicated to 'the inhabitants of the town, long before the state had an existence, for the purposes of a common, and while the legal title now is vested in the city it .is held by the city in trust for the inhabitants for that purpose, and when the property is no longer desired, or the purpose for which it was dedicated attainable, it will revert to the dedicator. Until then, its diversion from that' use by the city, or by the legislature, may be prevented by owners of lots whose property rights may be affected, arid by the city solicitor as the representative of the 'inhabitants. It is so easy to give away the prop *505 erty of others, so difficult to preserve public rights^' that it is necessary, in order to defeat the former and to. effect the latter, that the power to control; the use of property dedicated to the public must be limited to the purposes of the trust. In City of St. Paul v. The Chicago, Milwaukee & St. Paul Ry. Co., 63 Minn., 330, three times before the court, the council undertook by ordinance to grant to the defendant railway company the right to erect a freight house upon the public levee, under a statute which provided: “The common council, board of aldermen, trustees, commission-: ers, or other corporate authorities, in any city, town, village, or other municipal corporation, are-hereby authorized and empowered to grant, sell,’ convey, or lease any public grounds or place' within their respective corporate limits to any railroad corporation; subject nevertheless to all the rights of the original proprietors of such pub-, lie grounds.” In the opinion, it was said that the word “levee,” as used in the West and South, means a landing place for vessels, for the delivery of merchandise to and' from such vessels, and,' as incident to that, for the temporary storage of the merchandise. In other words, it is what in the present case has been denominated a public landing. And it is held that the áct did not confer power upon the city to make the grant. In the opinion (p. 352) it is said: “It is elementary and fundamental law that, if a grant is made for a specific, limited, and definite public use, the subject of the grant can not be used for another' and different use. Its use must be restricted to that for which it was dedicated. Even the legislature itself has no power to destroy the trust,'or *506 to divert, or to authorize a municipality to divert, its subject to any other purpose, either public or private, inconsistent with the particular use to which it was granted. Neither the state nor the municipality within which the property is situated has any proprietory interest in it which either of them can sell or divert to any use inconsistent with the purpose of the dedication or grant. The state holds such lands merely in its sovereign capacity in trust for the public for the purposes for which it was dedicated. If the legislature should attempt to divert it, or to authorize its diversion, the property would not revert to the donor, or the public easement be extinguished. The act of the legislature would be a mere nullity.”
In City of Chicago v. Ward et al., 169 Ill., 392, 61 Am. St. Rep., 185, it is held: “After land has been dedicated to a city for a public park and accepted by the city, the legislature has no power to divert the property dedicated from the purpose for which it was donated, such diversion would be an impairment of the vested rights of abutting property owners.” In Rowzee et al. v. Pierce et al., 75 Miss., 846, 65 Am. St. Rep., 625, it was held: “If municipal authorities are about to put property dedicated for use as an ornamental park to a different use, the donors of such property, or any lot owner, and perhaps any private citizen, may maintain a suit to enjoin the proposed use.”
In these cases and in others to which reference has been made or in cases herein cited the question of the ■ right' to maintain the suit by others than the abuting property owners is considered, but, being of the opinion that the section of the *507 municipal code hereafter referred to is broad enough to confer power upon the city solicitor to protect the interests of the inhabitants as distinguished from the interests of the abutting property owners, it is not thought necessary to give further consideration to that question.
It may not be improper to call attention to the fact that the right of the legislature to authorize property dedicated to a specific public use to be taken for a different public use in the exercise of the power of eminent domain is not here in question. The right to take it under that power is perhaps just as perfect after it has been dedicated to a public use as it was before such dedication. In The Inhabitants of Springfield v. The Connecticut River R. R. Co., 4 Cush., 63, 71, Chief Justice Shaw saysi “The power of eminent domain is a high prerogative, of sovereignty, founded upon public exigency, according to the maxim: salus republicae lex supreme est, to which all minor considerations must yield and which can only be limited by such exigency. The grant of land for one public use must yield to that of another more urgent.”
A recent case, The. Chicago, R. I. & P. Ry. Co. et al. v. People et al., 222 Ill., 427, 78 N. E. Rep., 790, is also in point.
- There being an entire.absence of power to make the grant, there is no room for an estoppel; and even if it were not such a case, Section 1536-667, Revised Statutes, does not confer a private right upon the solicitor, but imposes a duty in the interest of the public, and delay on his part in the exercise of it should not prejudice the- public. In Commonwealth v. Alburger et al., 1 Wharton, 469, 488, *508 Sergeant, J./says: “These principles, indeed, pervade the laws of the most enlightened nations, as well as our’own code, and are essential to the protection of public rights, which would be gradually-frittered away if the want of complaint or prosecution gave the party a right. Individuals may reasoiiably be held to a limited period to enforce their. rights against adverse occupants, because' they have an interest sufficient to make them vigilant. But in public rights of property, each individual 'feels but a slight interest and rather tolerates even a manifest encroachment, than seeks a dispute to set it right.”
The ordinance provides that nothing in the ordinance shall be takfen to confer upon the railroad company any interest in any adjacent or abutting private property, and that the grant is upon the condition that the railroad company at its own expense acquire the private property necessary for its tracks, and that the structure shall be of such height and character as not to interfere with the ordinary travel over the street. Just why this •was done does not appear. Is it to be implied that the municipal grantors because they were giving away the public property thought they had power to ’give • away also' private property ? And if the latter condition is to be given effect then the grant, would be just about as effective as the permission given to the daughter to go in swimming provided she didn’t go near the water. It does appear, and •that without the need of any testimony of expert •'witnesses, or any finding of facts, that this elevated railroad was to be constructed over the entire length of the landing, not for the purpose of -facilitating the use- of the landing for the purpose *509 for which it had been dedicated, but for the use of the railroad company. The occupancy of this part of the land in the manner proposed would be in effect an appropriation of it by the railroad company, and the grant .is inconsistent with and a diversion from the use for which the land was dedicated.

Judgment for the city.

Shauci-c, C. J., Price, Crew and Spear, JJ., concur.